# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH


## NO. 02-12-00095-CR

DOUGLAS LYNN KIRK                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

------------

### FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY

------------

# OPINION

------------

## I.  Introduction

In three issues, Appellant Douglas Lynn Kirk appeals his murder conviction.  We affirm.

## II.  Factual and Procedural Background

On the evening of April 24, 2010, Orlando Benavides helped Kirk move from 1700 Clover Lane to 2820 Raton Drive, loaning both his truck and physical labor.  Around 10:00 p.m., Kirk and Benavides made their last trip of the night to the Clover Lane house.  When Kirk and Benavides arrived at the Raton Drive

house, Alphonso Beza, who lived next door, approached them, introduced himself, and volunteered to help unload the truck. Kirk accepted Beza's offer, and Beza invited Pedro Diaz and another man to help unload the truck.

Around 1:00 a.m., Kirk announced that it was time for everyone to leave, said good night to Beza and Diaz, and walked Benavides to his truck. What occurred after Benavides left is disputed. Kirk claimed that he thought Beza and Diaz were trying to steal from him and that they threatened him. After firing four warning shots into the ceiling of his house, he kneeled in the corner of a bedroom and fired down the hallway, killing both men.

Kirk was charged with murdering Beza and Diaz by shooting them with a firearm.[1] The State presented evidence to counter Kirk's self-defense and defense-of-property theories, and after deadlocking on counts one and two, the jury found Kirk guilty of count three—causing Diaz's death by shooting him with a firearm—and assessed his punishment at forty-seven years' confinement and a $1,000 fine. This appeal followed.

---

[1]Specifically, count one alleged that Kirk had committed capital murder by intentionally causing Beza's and Diaz's deaths by shooting them with a firearm during the same criminal transaction. Counts two and three addressed each individual shooting as murder.

### III. Sufficiency

In his first issue, Kirk argues that the evidence is insufficient to sustain the verdict because the State failed to disprove that he acted in self-defense and in defense of property.

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Wise*, 364 S.W.3d at 903. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the

light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Wise*, 364 S.W.3d at 903.

We must consider all the evidence admitted at trial, even improperly admitted evidence, when performing a sufficiency review. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Moff v. State,* 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

After the defendant has introduced some evidence supporting a defense under section 2.03 of the penal code, the State bears the burden of persuasion to disprove it. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (explaining that a conviction produces an implicit finding against the defensive theory). The burden of persuasion does not require the production of evidence; rather, it requires the State to prove its case beyond a reasonable doubt. *Id.* To determine sufficiency of the evidence to disprove a self-defense claim, we ask whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have found against appellant on the defensive issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *see also Smith v. State*, 355 S.W.3d 138, 144–47 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (applying

*Saxton* and *Zuliani* to the jury's rejection of the defendant's self-defense and defense-of-third-person theories).

Penal code sections 9.31 and 9.32 provide in relevant part that a person is justified in using deadly force against another "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." Tex. Penal Code Ann. §§ 9.31(a), 9.32(a)(1)–(2)(A) (West 2011). Additionally, penal code section 9.42 provides that a person is justified in using deadly force against another to protect land or tangible, movable property:

> (1)　　if he would be justified in using force against the other under Section 9.41[2]; and
>
> (2)　　when and to the degree he reasonably believes the deadly force is immediately necessary:
>
>> (A) to prevent the other's imminent commission of arson, burglary, robbery, aggravated robbery, theft during the nighttime, or criminal mischief during the nighttime; or
>>
>> (B) to prevent the other who is fleeing immediately after committing burglary, robbery, aggravated robbery, or theft during the nighttime from escaping with the property; and
>
> (3)　　he reasonably believes that:

---

[2]A person in lawful possession of land or tangible, movable property is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property. *Id.* § 9.41(a) (West 2011).

5

> (A) the land or property cannot be protected or recovered by any other means; or
>
> (B) the use of force other than deadly force to protect or recover the land or property would expose the actor or another to a substantial risk of death or serious bodily injury.

*Id.* § 9.42.

## B. Evidence

Kirk contends that he "had a legitimate fear for his life" and that he "reasonably believed that Beza and Diaz were going to hurt him and rob him of his property." In support of his contention, Kirk points to his own testimony and the version of events he gave to the jury describing what happened that night.

### 1. The State's Evidence

Isabel Diaz testified that Beza, her fiancée, and Diaz, her brother, had been drinking beer and playing with her kids and nephew in front of her house on the evening of April 24, 2010. She testified that Beza and Diaz went next door to Kirk's house around 11:00 p.m. to help Kirk move in and that Beza had appeared happy and indicated that there was free beer. When Isabel awoke the following morning to find that Beza and Diaz had not returned home, she became concerned, walked outside, and saw Kirk and another man walking towards Kirk's house. She asked Kirk if he knew where Beza and Diaz were. Kirk told her that he did not know where they were, so she went back inside her house and called the police.

When first responders arrived and found a semiautomatic rifle in the bushes underneath a broken window at Kirk's residence, they searched the house and found Beza's and Diaz's bodies in the hallway. A detailed search of the bedrooms and closets revealed boxes of ammunition and numerous loaded weapons, including rifles, shotguns, pistols, and hunting bows. Ballistics tests later confirmed that the semiautomatic rifle found in the bushes outside of Kirk's house fired the rounds that killed Beza and Diaz. The police also found empty beer cans and bottles of liquor scattered around the kitchen and on the living room floor.

The police also searched the Clover Lane house and discovered a variety of unusual objects including, among other things, a plastic manikin torso and head suspended by a noose around its neck, several pieces of animal skulls, jawbones, antlers, and a faux human skeleton with a chain locked to its ankle and a vice grip next to its knee. Photographs of these items were admitted and published to the jury over Kirk's objection.

Kirk's friend, Benavides, testified that he helped Kirk move from the Clover Lane house to the Raton Drive house on the night of April 24. He testified that he had taken a final load of items back to the Raton house around 10:30 p.m. after stopping at a gas station to pick up two eighteen-packs of beer. Upon arriving at the Raton Drive house, Benavides spoke with Beza, who identified himself as the next door neighbor and offered to help them unload Kirk's belongings. Benavides testified that after Kirk had told Beza he could help them

7

unpack, Beza called Diaz and his nephew over to help as well. Benavides further testified that once the unloading was finished, the group sat on the front porch and began drinking beer. He stated that everyone was friendly and laughing and that they eventually moved inside and continued drinking.

Benavides testified that he lit a joint and offered to share it with the rest of the group, but they all declined. Diaz told Benavides that he could not smoke pot because he was on parole. Benavides testified that he left the house around 1:00 a.m. and that he thought Kirk had walked with him outside to his truck, but he could not remember for sure. He stated that the mood inside the house was light and that nobody was arguing or upset when he decided to leave. Benavides further testified that around noon the next day, Kirk called him and asked what had happened the night before.

Dennis Joiner, who lived across the street from the Raton Drive house, testified that he had seen a white man and a Hispanic man laughing and conversing in front of Kirk's house when he came home from work on April 25 at 1:00 a.m. As Joiner exited his car and walked towards his house, he watched the men move back into Kirk's home and claimed that the two seemed cordial. He said that at one point, the white man stood in the doorway and seemed to summon the Hispanic man into the house. Joiner said the Hispanic man was smiling, walked into the house, and stood in the doorway conversing with someone inside. Joiner could not hear the conversation but said that it did not appear that the men were arguing. After the Hispanic man closed the door,

8

Joiner went into his house. Joiner said that he heard four popping sounds around 1:35 a.m. or 1:45 a.m. and that he thought it was his sister-in-law's dog that lives in his house. He said that the four sounds could have occurred later.

Kirk's friend, Jana Thompson, who lived next door to the Raton Drive house, testified that she had helped Kirk place newspaper on the Raton Drive house's backdoor windows between 7:30 and 9:30 p.m. on April 24 before she went home to sleep. She further testified that Kirk had appeared at her door around 5:00 the next morning, said he was scared, and appeared to be in shock. She stated that she had told Kirk that everything was going to be fine and that he kept repeating that he was scared before he turned around and walked away.

Kirk's friend Cody White, who lived next door to the Clover Lane house, testified that Kirk came to his house on April 25 and asked for a ride to the Raton house. White said that Kirk was disheveled and was acting "crazy" and that Kirk told him that he had walked the four miles from the Raton Drive house to the Clover Lane house the night before. When White asked why he had walked the long distance, Kirk said that he was being chased by the police, criminals, ghosts, or demons. White drove Kirk to the Raton Drive house, and when they saw Beza's and Diaz's bodies inside, Kirk said, "I can't believe I did it."

White testified that he had immediately left the Raton Drive house when he saw Diaz's and Beza's bodies and that he had called Kirk at 12:30 p.m.—soon after he left—to ask him what had happened the night before. Kirk told White that he did not know what had happened, and when White asked about the

9

bodies on the floor, Kirk told him that he had fired his assault rifle at two people. White testified that when he told Kirk he was going to call the police, Kirk responded, "Don't call the police. I will take care of it."

Medical examiner Marc Krouse testified that a toxicology report showed that Beza and Diaz were highly intoxicated at the time of the shootings. Krouse stated that Diaz was so intoxicated—close to five times the accepted level for driving—that he might have considered intoxication the cause of death absent other evidence and that Diaz's extreme intoxication would have impaired his gross motor functions. The trial court also admitted into evidence photographs showing a beer can near Beza's hand at the crime scene.

Krouse's forensic examination showed that Beza was shot three times in the back and once in the side of the head behind the ear. Krouse testified that all of Beza's wounds except one to his left arm had a distinct downward trajectory that meant he was either "on his way to the floor or on the floor when he was shot."

### 2. Kirk's Evidence

Kirk testified that Thompson had met him and Benavides at the Raton Drive house around 7:30 p.m. and had helped him tape newspapers over the glass of the back door because he had been "alerted to the fact that the house had had a number of . . . recent break-ins." After Thompson went home around 9:30 p.m., he and Benavides made a final trip to the Clover Lane house to gather more of his belongings. When they arrived back at the Raton house around

10

11:00 p.m., Beza was next door and asked if they needed help unloading. Kirk testified that Beza and Diaz helped them move his box spring and mattress inside the house and that afterwards the group began drinking. Kirk stated that he had noticed what appeared to be prison tattoos on both Beza and Diaz, and when he asked Diaz how he got the tattoos, Diaz told him "something about a long prison term."

Kirk testified that after walking Benavides to his car at around 1:00 a.m., he thought that Diaz and Beza were attempting to steal from him because some items in the house had been moved while Kirk was outside. He said that he had asked the men to leave and the group went to the front yard. He stated that he had told the men that he was going to call the police if anything was missing and that the men threatened him and prevented him from closing the door when he attempted to return inside. Kirk testified that the two men began "acting like they were wanting some kind of altercation" and that they had told him, "We can make you sorry if you fuck with us." He further testified that he had asked the men to leave a second time and that they continued to threaten him and refused to leave.

Kirk testified that he ran into the front bedroom closet, found his rifle, and heard the men coming down the hallway toward him. They began shouting expletives, and he feared for his life. Believing that the men had armed themselves with loaded guns from other rooms in the house, he fired three or four warning shots into the closet ceiling. After firing the warning shots, Kirk

11

moved across the bedroom and got down on one knee. He saw Beza and Diaz facing him in the hallway leading to the front bedroom, so he shot at both men.

Kirk testified that after the shooting, he exited the house by breaking through the bedroom window, ran next door to Thompson's house, and began knocking on her door and ringing the doorbell. When Thompson refused to let him in, Kirk made his way on foot back to the Clover Lane house and knocked on White's door.

Kirk admitted during cross-examination that he had told White not to call the police and that he would "take care" of the situation. Kirk also testified that after he had seen the bodies, he had left the house and had called his work colleague Robert Nickerson.

Nickerson testified that Kirk had called him several times around 1:00 p.m. on April 25, 2010, but that he missed the calls and called Kirk back around 2:30 p.m. Nickerson testified that Kirk seemed confused about what had happened on the night of the shootings. Nickerson said that Kirk had told him he thought he had shot two people who had helped him move into his new house. Nickerson also testified that he had asked Kirk whether he had been robbed and that Kirk had said, "I do not remember." Kirk testified that after speaking with Nickerson, he had contacted an attorney and then had turned himself in to the police.

12

## C. Analysis

Viewing the evidence in the light most favorable to the verdict, we hold that sufficient evidence supported the jury's rejection of Kirk's self-defense claim. *See Saxton*, 804 S.W.2d at 914. Although Kirk testified that he thought Diaz and Beza were threatening him and stealing from him, testimony from White and Nickerson indicated that Kirk was not sure what had happened within twelve hours of the shooting and even after seeing the bodies. As the sole judge of credibility, the jury was free to disregard Kirk's testimony. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Wise*, 364 S.W.3d at 903.

Additionally, Kirk left the scene immediately after the shooting; did not ask Thompson for help or to call the police when he went to her house several hours after the alleged time of the shooting;[3] and after confirming that he had shot Diaz and Beza, he told White not to call the police, fled the scene again, and did not contact the authorities to report the shooting until the evening of April 25, 2010. Flight is circumstantial evidence from which a jury may infer guilt. *See Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011).

Further, the record reflects that both Diaz and Beza were extremely intoxicated. The jury could have reasonably determined that due to the men's

---

[3]Thompson testified that Kirk began knocking on her door around 5:00 a.m. on the morning of April 25—approximately three-and-a-half hours after the time Kirk alleged that the men threatened him and he shot them. Kirk offered no explanation for this gap.

13

intoxicated state, Kirk's belief that they were going to hurt and rob him was unreasonable. The evidence also indicated that Beza was likely carrying a beer when he was shot, which weighs against Kirk's testimony that the men were approaching him in a threatening manner.

Furthermore, the jury was entitled to conclude that Kirk's belief that deadly force was immediately necessary was unreasonable, given that Beza was shot in the back several times and the forensic evidence showed that the shots were fired at a downward trajectory. *See Saxton*, 804 S.W.2d at 913 (holding that there was sufficient physical evidence to contradict an appellant's claim that the shooting was an accident). Finally, because Diaz had earlier in the evening expressed his reluctance to engage in criminal activity out of concern for his parole status, the jury could have reasonably rejected Kirk's contention that Diaz later attempted to assault and rob him. *See Sorrells*, 343 S.W.3d at 155.

Based on the foregoing, we hold that a rational jury could have rejected Kirk's self-defense and defense-of-property claims beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914. Therefore, we overrule Kirk's first issue.

## IV. Admission of Evidence

In his second issue, Kirk contends that the trial court erred by overruling his objections to the State's Clover Lane house photographs. At trial, Kirk objected under rules of evidence 402 and 403, arguing that the photographs

14

were not relevant and that their prejudicial effect substantially outweighed their probative value.[4]

## A. Standard of Review

We review the trial court's admission of evidence for an abuse of discretion. *Allen v. State*, 202 S.W.3d 364, 367 (Tex. App.—Fort Worth 2006, pet. ref'd) (op. on reh'g); *see Montgomery v. State*, 810 S.W.2d 372, 390–91 (Tex. Crim. App. 1991) (op. on reh'g). Under this standard, the trial court's ruling will be upheld as long as it falls within the "zone of reasonable disagreement" and is correct under any theory of law applicable to the case. *Alami v. State*, 333 S.W.3d 881, 889 (Tex. App.—Fort Worth 2011, no pet.); *Karnes v. State*, 127 S.W.3d 184, 189 (Tex. App.—Fort Worth 2003, pet. ref'd), *cert. denied*, 556 U.S. 1241 (2009).

## B. Applicable Law

Rule 402 states that "[a]ll relevant evidence is admissible, except as otherwise provided" and that "[e]vidence which is not relevant is inadmissible." Tex. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Tex. R. Evid. 401.

---

[4]On appeal, Kirk also asserts that the evidence is inadmissible under rule 404(b). However, we consider only those grounds that Kirk raised in the trial court. *See* Tex. R. App. P. 33.1; *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

Under rule 403, evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence. Tex. R. Evid. 403. Once a rule 403 objection is made, the trial court must weigh the probative value of the evidence to determine if it is substantially outweighed by its potential for unfair prejudice. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). A rule 403 balancing test includes the following factors: (1) the inherent probative force of the proffered item of evidence along with (2) the proponents need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). The rules of evidence favor the admission of relevant evidence and carry a presumption that relevant evidence is more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 832 (1997).

Rule 403 requires that a photograph have some probative value and that its probative value not be substantially outweighed by its inflammatory nature. *See* Tex. R. Evid. 403; *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App.

16

2009), *cert. denied*, 130 S. Ct. 3411 (2010). Photographs are neither cumulative nor lacking in significant probative value simply because they merely corroborate other kinds of evidence. *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000). Among the many factors a court may consider in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice are the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close up, the availability of other means of proof, and other circumstances unique to the individual case. *Reese v. State*, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000); *Santellan*, 939 S.W.2d at 172.

## C. The Complained-of Evidence

Officer Christopher Bain testified that he executed a search warrant at the Clover Lane house on April 26, 2010. Officer Bain took photographs of a number of unusual items found inside the residence, including: a plastic manikin torso and head suspended by a noose around its neck; a drawing on the wall with the letters "FTW" written above a skull;[5] several pieces of animal skulls, jawbones, and antlers; several replica human skulls holding what appeared to be melted candle wax; a faux human skeleton with a chain locked to its ankle and a vice grip located next to its knee; the carcass of a large spider inside of a glass display case; a faux human skull on a lamp; and what appears to be a statue of

_____

[5]Officer Bain testified that the letters stood for "Fuck The World," which he opined represented one's general negative attitude towards life.

17

either a demon or a dragon. The photographs were published to the jury over Kirk's objection.

## D. Harmless Error

Assuming without deciding that the trial court abused its discretion by admitting this evidence, we will review its actions and disregard the error if it did not affect appellant's substantial rights. Tex. R. App. P. 44.2(b); *see Mosley*, 983 S.W.2d at 259; *see also Solomon v. State*, 49 S.W.3d 356, 364 (Tex. Crim. App. 2001) (holding that trial court error regarding admission of evidence is generally nonconstitutional error); *Stewart v. State*, 221 S.W.3d 306, 310 (Tex. App.—Fort Worth 2007, no pet.).

A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon*, 49 S.W.3d at 365; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also

consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

## E. Analysis

Kirk contends that the admission of the photographs was harmful because it was "inflammatory, irrelevant evidence that was designed to degrade and dehumanize Kirk in the eyes of the jury." Outside the jury's presence, the State argued that the photographs tended to show Kirk's state of mind and that the skeletons, the "Choking Charlie," and the "FTW" written on the wall indicated an obsession or tendency towards violence. During closing argument, the prosecutor referenced the photographs a single time, stating: "What happens when you have an angry and resentful attitude to the world, an attitude that says 'Fuck the world,' and you add . . . alcohol to that mix and then add loaded firearms?" Although the State attempted to portray Kirk as a person obsessed with violence by showing the photographs of the macabre items located in his house, the jury also heard Kirk's explanation of why he owned these items.

The prosecutor asked Kirk on cross-examination if the skulls were a reflection of his mind, and he responded that "they were little bitty Halloween regalia" that were given to him by a girl he used to live with that had children. Kirk, who worked as a health care professional, further explained that a Merck drug representative gave him the skeleton and that the items around the skeleton included an antique railroad lock, an anvil, and an "old-timey iron." Kirk also

19

testified that the animal skulls and jawbones were things that he had collected and were part of the décor of his house.

As for the dead spider, Kirk stated that it was a tarantula named "Fuzzy" that he had kept for three or four years before it died and that "[he] always read stuff about entomology and biology and earth science," so he did not think that keeping spiders was "any big deal." And although Officer Bain testified that the letters "FTW" represented a general negative attitude towards life, Kirk testified that the letters stood for "Fort Worth." The jury, as the sole judge of the witnesses' credibility and the evidence, had the means to discern whether the items in the photographs represented an obsession with violence or merely poor taste and a penchant for collecting strange things.

Furthermore, in addition to the complained-of photographs, the State presented witness testimony and forensic evidence that contradicted Kirk's version of events, which we set out in detail in our analysis of Kirk's first issue. In comparison to the substantial amount of physical and testimonial evidence presented over the course of the five-day trial, the eight challenged photographs comprise an insignificant portion of that evidence in the context of the entire case against Kirk. Moreover, the record reflects that the State did not repeatedly reference the photographs or draw the jury's attention toward them. Although the complained-of evidence may have portrayed Kirk in a distasteful light, we cannot conclude that the photographs likely moved the jury from acquitting Kirk to convicting him. *See* Tex. R. App. 44.2(b); *Wesbrook v. State*, 29 S.W.3d 103,

20

119 (Tex. Crim. App. 2000) (stating that in determining harm, we may ask whether there is a reasonable possibility that the error "moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question"), *cert. denied*, 532 U.S. 944 (2001).

Accordingly, we hold that even if the trial court erred by admitting the photographs, the alleged error did not have a substantial and injurious effect or influence in determining the jury's verdict. *See* Tex. R. App. 44.2(b); *King*, 953 S.W.2d at 271. Therefore, we overrule Kirk's second point.

### V. Supplemental Jury Instruction

In his third issue, Kirk argues that the trial court erred by giving the jury a supplemental instruction in violation of code of criminal procedure article 36.16.

### A. Standard of Review

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends. *Id.*

### B. Analysis

Here, after four days of deliberation, the jury sent a note to the trial court indicating that it had deadlocked on count one. After the trial court asked the jury to continue their deliberating, the jury sent another note five hours later, indicating that it was still deadlocked on count one. The trial court then submitted

21

a modified *Allen* charge[6] that asked the jury to continue its deliberations and warned that if the jurors could not reach an agreement as to count one, "it [would] be necessary for the court to declare a mistrial on Count One." In the afternoon of the next day, the jury told the trial court that it was deadlocked and that it understood the implications of that deadlock leading to a mistrial.

After extensive discussion with the prosecutor and defense counsel, the trial court presented the following supplemental instruction to the jury:

> If the jury finds itself unable to unanimously agree on a verdict with respect to Count One of the indictment, you will next consider whether or not the Defendant is guilty of the offenses of murder as charged in Counts Two and Three of the indictment.

> If you believe from the evidence beyond a reasonable doubt that the defendant is guilty of either capital murder as charged in Count One of the indictment or murder as charged in Counts Two or Three of the indictment, but you have a reasonable doubt as to which of said offenses he is guilty, then you must resolve that doubt in the defendant's favor and find him guilty of the lesser offense of murder.

> If you have a reasonable doubt as to whether the Defendant is guilty of any offense defined in the charge you will acquit the defendant and say by your verdict "Not Guilty."

In support of issuing the supplemental instruction, the trial court cited the court of criminal appeals's decision in *Barrios v. State*, in which the court held that the jury does not have to unanimously agree that a defendant is not guilty of the

---

[6]*See Allen v. United States*, 164 U.S. 492, 501–02, 17 S. Ct. 154, 157 (1896).

greater offense before considering a lesser-included offense, *see* 283 S.W.3d 348, 353 (Tex. Crim. App. 2009), and the trial court further explained that

> for all the reasons set out in [*Barrios*] the Court would propose that language because we have told them—we told the jury what they are to do in the event they find guilty on count one. We've also told the jury what to do in case they were to find not guilty on count one, but what we have not done is to instruct them on what to do if they are not able to reach a unanimous verdict on count one. So this language informs them of exactly how to proceed in the situation they are now apparently in.

Kirk objected that the additional instruction was untimely and that the State had waived any opportunity to supplement the charge. *See* Tex. Code Crim. Proc. Ann. art. 36.16 (West 2006) (listing circumstances under which charge can be supplemented after deliberations have begun).

Kirk contends that it was error to provide this supplemental instruction because deliberations had already begun and the prerequisites of article 36.16 had not been met. Code of criminal procedure article 36.16 states that "[a]fter the argument begins no further charge shall be given to the jury unless required by the improper argument of counsel or the request of the jury, or unless the judge shall, in his discretion, permit the introduction of other testimony." *Id.* Article 36.16 governs supplemental jury charges, and it does not, in all instances, prevent the trial court from submitting a supplemental charge after deliberations have begun. *See Smith v. State*, 898 S.W.2d 838, 854–55 (Tex. Crim. App.), *cert. denied*, 516 U.S. 843 (1995); *Roberson v. State*, 113 S.W.3d 381, 384 (Tex. App.—Fort Worth 2003, pet. ref'd). Additionally, the court of criminal appeals has

23

consistently allowed a trial court to correct its charge if it is convinced that an erroneous charge has been given. *See Smith*, 898 S.W.2d at 854–55; *Roberson*, 113 S.W.3d, at 384.

Here, after receiving three notes indicating that the jury was deadlocked on count one, the trial court became convinced that it had given an erroneous charge that failed to delineate the proper procedure if the jury became deadlocked on the greater offense charged in count one. Accordingly, we hold that the trial court did not violate article 36.16 when it issued the supplemental instruction and directed the jury to consider the lesser-included offenses in accordance with *Barrios*. *See* Tex. Code Crim. Proc. Ann. art. 36.16; *Barrios*, 283 S.W.3d at 353; *see also Roberson*, 113 S.W.3d at 385 (holding that supplemental charge did not violate article 36.16 when trial court became convinced that it had given erroneous charge); *Dusek v. State*, 978 S.W.2d 129, 136–37 (Tex. App.—Austin 1998, pet. ref'd) (holding supplemental charge correcting erroneous instruction was not error when it was submitted in response to a jury note reflecting confusion). Therefore, we overrule Kirk's third issue.

24

## VI. Conclusion

Having overruled all of Kirk's issues, we affirm the trial court's judgment.

/s/ Bob McCoy

BOB MCCOY
JUSTICE

PANEL:  DAUPHINOT, MCCOY, and MEIER, JJ.

DAUPHINOT, J., filed a dissenting opinion.

PUBLISH

DELIVERED:  January 23, 2014

25