

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00164-CR

_____

CAMERON LAVON STEPHENS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1695946

---

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

## I. Introduction

On June 23, 2021, at around 7 p.m., a fight in the parking lot of Hurricane Harbor, an Arlington water park, resulted in 16-year-old D.T.'s[1] death from a single gunshot wound. *See Williams v. Hurricane Harbor, LP*, No. 02-25-00160-CV, 2026 WL 1449846, at *1 (Tex. App.—Fort Worth May 21, 2026, no pet. h.) (mem. op.) (recounting background of civil claim for D.T.'s death). Appellant Cameron Lavon Stephens told his brother—17-year-old K.V., who was with him during the fight—that he had fired his gun. Stephens told his father that he had shot and killed someone at the water park. An eyewitness identified Stephens as the shooter.

The State charged Stephens with D.T.'s murder, and although he pleaded not guilty and testified that he had acted in self-defense and in defense of others, a jury found him guilty of D.T.'s murder after deliberating for around an hour and a half. The jury assessed a 40-year sentence, and the trial court entered judgment accordingly.

In a single issue, Stephens complains that the evidence is insufficient to support his conviction and that the trial court thereby erred by denying his motion for directed

---

[1]We use initials to identify any person who, at the time of the offense, was a minor or, if the record is unclear, might have been a minor. *See* Tex. R. App. P. 9.10(a)(3).

verdict.[2] Because the evidence is sufficient, we overrule Stephens's issue and affirm the trial court's judgment.

## II. Sufficiency

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Baltimore v. State*, 689 S.W.3d 331, 341 (Tex. Crim. App. 2024). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Edward v. State*, 635 S.W.3d 649, 656 (Tex. Crim. App. 2021); *see Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020) (explaining that the jury can believe all, some, or none of a witness's testimony and that it may draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial). The jury is the exclusive judge of the witnesses' credibility and the weight to be given their testimonies. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (stating that a jury may infer intent to kill from use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the weapon's use).

---

[2]A challenge to the denial of an instructed-verdict motion is a challenge to evidentiary sufficiency. *Smith v. State*, 499 S.W.3d 1, 6 (Tex. Crim. App. 2016).

## A. The parties' arguments

Stephens argues that the evidence "did not establish that he fired the shot that killed [D.T.] as no witnesses testified where [he] had pointed his firearm at anyone at the time of the shooting." He contends that his testimony that he did not aim at anyone supports his argument and that the other evidence fails to show that he had intended to cause or had known that he would cause D.T.'s death; that he had intended to cause serious bodily injury to any person; or that he had sufficient knowledge or intent to support a murder conviction, directly or under transferred intent. He further argues that the evidence is insufficient to establish that his conduct rose above recklessness when the State did not elicit evidence, such as ballistics or trajectory, from which the jury could have drawn such inferences.

The State recounts the following as sufficient to support the conviction because a reasonable jury could infer from this evidence that Stephens had retrieved his gun and had shot directly at D.T. or that he had fired into the crowd with reasonable certainty to result in death:

- Stephens was at the scene and had a gun in his car.

- Stephens, a gang affiliate, started a fight with a rival gang's affiliates and retrieved his gun from his car.

- An eyewitness saw Stephens fire several shots from his gun but saw no one else with a gun, and all the shots heard by that witness came from Stephens's gun.

- D.T. was shot in the back and killed.

- After firing his gun, Stephens and K.V. fled the scene.

4

- As Stephens and K.V. fled, Stephens said that he thought he "shot that boy."

- At a bond hearing, Stephens's father told the trial court that Stephens told him that he shot and killed someone at an Arlington water park.

- After the shooting, Stephens disposed of his gun.

## B. Other evidence

In addition to the evidence above, the record also reflects the following.

### 1. The State's case

K.V.[3] testified that he, Stephens, and Stephens's girlfriend Jewelandria Reagler had gone to Hurricane Harbor in K.V.'s black Chevy Malibu in June 2021 a few hours before closing. When he left the water park later, he saw Stephens on the ground as "six or seven guys stomp[ed] [and] kick[ed]" him almost directly in front of the park's exit, near K.V.'s car. K.V. joined the fight because Stephens had previously suffered a traumatic brain injury as a child and could have died if reinjured. Although K.V. heard gunshots,[4] he did not know from where they were fired or who had fired them. He also claimed that he had seen "probably like a handgun and like a rifle type of gun" in the hands of some people running back into the park as he and Stephens left the scene. They left without Reagler, and he did not recall where he dropped off Stephens.

---

[3]The State subpoenaed K.V. and Stephens's father to testify.

[4]K.V. testified at trial that he heard two or three gunshots and stated that the court reporter at Stephens's January 2022 bond hearing must have twice misheard him say "gunshot" instead of "gunshots" and that Stephens's counsel at the time had "messed up" when he did not clarify that it had been multiple gunshots.

K.V. and Stephens had each had a gun in the car that day; K.V.'s gun was still in the car when the police impounded it a couple of days later, but Stephens's gun was not. K.V. stated that he did not know where Stephens's gun was and that he did not ask Stephens about it.

Like K.V., Stephens's father Marcus[5] contended that his bond-hearing testimony had been incorrect. He asserted at trial that Stephens had told him that he had been charged with murder but had not claimed to have killed anyone. Marcus recalled having made the statements about Stephens's admissions but insisted that he had misspoken because he had been nervous. The following colloquy ensued:

> Q. . . .[H]e told you that he shot and killed someone at a water park here in Arlington. That was the question.
>
> A. Yes, sir.
>
> Q. Pretty direct, pretty straightforward, pretty simple. You agree?
>
> A. Per the paper, yes, sir.
>
> Q. Well, that was the question, right? And your answer was what?
>
> . . . .
>
> [A.] At that time I said yes, sir.

_____

[5]We identify Stephens's father by his first name because they share the same last name.

Marcus also opined that Stephens—who had been 18 years old at the time—had acted in self-defense and would not have "intentionally go[ne] out to hurt someone."[6]

Eyewitness Francisco Robles testified that he had been at Hurricane Harbor that day with his wife and three children and had witnessed both the fight at the front entrance involving around ten people and then Stephens's firing five to ten shots. Stephens was the only person that he saw holding a gun, and he identified Stephens in a photo lineup and at trial. He also saw a red Dodge Charger at the scene and heard it screech away after the gunshots, but he did not see how many people jumped into it before it tore out of the parking lot.

D.T.'s friend Isaiah Simpson testified that they had been part of a group of around six at the water park that day. His group had exited together, where they saw Quinton Norton pull into the parking lot in a red Charger. His group went to greet Norton and visited briefly before Stephens interrupted them. Simpson said that Stephens asked if they knew "some 2200 people" or "somebody named Famous John."[7] Stephens also told them that he knew N.W., one of the people in their group. Simpson turned to N.W. to ask him how he knew Stephens, at which point Stephens

---

[6]This assertion allowed the State to question Marcus about Stephens's February 2019 juvenile-court disposition adjudicating him for assault. Marcus testified that he had not been aware of the assault or Stephens's stipulation to it and that it did not change his opinion about Stephens.

[7]The record reflects that the 2200 is a rival gang but does not indicate who Famous John was.

hit Simpson, starting the brawl. Stephens was on the ground when his brother came to help him.

Simpson testified that D.T. had not been involved in the fight; instead, after he had greeted Norton, D.T. stood by his cousin D.W. and talked to a girl "while all of this was going on." Simpson stated that after Stephens's brother joined the fight, Stephens got up and ran towards his car. Simpson then yelled out "gun!" He stated, "I knew what time it was," explaining that when someone is losing a fight, "they're quick to shoot somebody," and given the number of people on his side of the fight, he figured Stephens "was probably trying to defend hi[m]self." He said everybody scattered when he yelled "gun" because no one on his side of the fight had any weapons. He then heard three gunshots. He, N.W., and a third individual ran to his car,[8] where he received a call from D.W. telling him that D.T. had been hit. Simpson later learned that Stephens and N.W. had gone to school together.

Simpson identified Stephens from a photo lineup and identified him at trial but admitted during cross-examination that he and his friends had provided social-media information to law enforcement before he viewed the lineup. Simpson also admitted during cross-examination that he did not know that Stephens had fired a gun but that

---

[8]The record does not reflect the make, model, or color of Simpson's car, which Simpson testified he had parked across the street from Hurricane Harbor.

he was "pretty sure." He had been unaware that one of his companions that day had a gun in a backpack.

Arlington Police Detective Phillip Williams recounted his investigation. He spoke with an off-duty Arlington police officer who had been working security at the park that day and who described the fight to him. The off-duty officer had also heard the gunshot—but did not see who had fired it—and he had seen K.V.'s vehicle "trying to scramble to get out." The four people in the red Charger—Norton, T.D., "David,"[9] and T.E.—were detained and tested for gunshot residue, but Detective Williams stated that no gunshot residue was found on them. N.W. identified Stephens as the shooter. Norton was later shown a photo lineup that contained Stephens but was unable to identify anyone.

Detective Williams obtained a warrant for K.V.'s vehicle—where he found K.V.'s gun under the passenger seat—and obtained a warrant for Norton's red Charger, which had returned to the scene after speeding away and where a backpack containing a loaded gun was found in the backseat. He sent both guns to the Department of Public Safety for testing, but neither gun matched the projectile recovered from D.T.'s body. He learned from the Irving police department that Stephens was an affiliate of a gang

---

[9]Because this individual's name shares the same initials as another already mentioned in this opinion, we use a pseudonym for his name.

called Youngins In Charge (YIC), rivals of the 2200 gang, of which N.W. was an affiliate.

The trial court admitted into evidence autopsy photos of D.T. and of the projectile recovered from his body. The photos showed no trauma to his face or marks on his hands that would indicate he had been involved in a fight but did show a visible bullet wound on his back. Based on the wound, the State's expert opined that D.T. would have bled to death rapidly.

In addition to witness testimony, the trial court admitted into evidence the park's surveillance video, still-shot photos from that video, a Hurricane Harbor employee's body-camera video, and Simpson's 911 call. The surveillance video and still-shot photos showed D.T. walking out of the park behind Simpson and a few others. The surveillance video also showed that at 7:03 p.m., D.W. jumped over the retaining wall near the exit and hid on the other side of the wall as D.T.'s body dropped to the ground.

The body-camera video showed the employee's interaction with Robles and the spot from which Robles had viewed the fight and shooting. Simpson reported at 7:05 p.m. in his 911 call that his cousin "got shot at Hurricane Harbor" after a fight broke out when "[s]ome dudes had come up to one of [his] friends, asked if he knew somebody." He reported that he heard the gunshot but "didn't know where the gunshots were coming from" and that someone had called him to tell him his cousin had been shot.

## 2. The Defense's case

Reagler, Stephens's girlfriend at the time of the offense, testified that they had gone to the crowded water park three or four hours before closing. They parked "not super close" to the entrance, and then K.V. left them to see a girl he was meeting there. When they entered the park, Stephens saw a group of people that "didn't like him." They had been there only ten minutes at that point, but he had started acting nervous and afraid and had been ready to go. Her solution was to go to another area of the park. The next time they saw that group, she told Stephens that they could leave but that before they left, she wanted to get something to eat because their park passes included food. Stephens grew increasingly frustrated and, on their way out, he left the park by himself while she visited the bathroom.

When Reagler left the park, the first thing she saw was Stephens on the ground with three or four people on top of him and K.V. fighting with two or three people. Stephens had moved K.V.'s car right in front. She stated that she heard a gunshot while Stephens was still fighting. She stated, "[W]hen I heard the first shot, it wasn't a lot of commotion, but seconds shortly after that it was a lot of shots. Not a lot of shots, but more shots. And the whole park just started going crazy." She also reported having seen some guys run back into the park with guns.

During cross-examination, Reagler agreed that when she testified at Stephens's bond hearing, she had not mentioned that Stephens had been scared but rather that they "got into a small argument about food" and that she had not mentioned seeing

11

anyone with a gun in the park. She had not known that Stephens was associated with the YIC gang, that he and K.V. had guns in the car that day, that he had admitted to K.V. that he had shot someone, or that he had admitted to his father that he had murdered someone. She agreed that she had been too far away to see who shot the gun.

Like Reagler, Stephens testified that he had asked her to leave the park as soon as he saw a group that was "known to hang out with people that [his] group of friends . . . had problems with." He stated, "I went to school with [N.W.]. And from social media I know that he's friends with the group of people that my friends had problems with." He became nervous and told Reagler he wanted to leave, but she wanted to stay, so they compromised by going to the park's other side. They were there for around three hours, and the food issue arose 30 to 45 minutes before they left. On their way out, he ran into K.V. and told him that he would move the car closer to the entrance, and then Reagler went to use the bathroom before they left.

Stephens moved the car into a handicapped spot, turned the car off, and sat on the car's hood so K.V. and Reagler could spot him. He sat there for five to ten minutes before he saw Simpson's group heading in his direction. As the group neared, a red Charger pulled up against the flow of traffic, and the group communicated with the Charger's driver. He became nervous as some of the guys stared at him. Stephens claimed that one of them shouted out, "[H]ey, you be with YIC?" He said yes, and then asked them, "[Y]'all be with 2200, right? Y'all know Famous John?" He stated that they said yes.

12

Stephens testified that the group of seven or eight walked toward him so he got up from his car's hood and asked, "[W]hat's up?" The group's leader responded with the same question and then punched Stephens. Stephens punched him back, they fought, and the rest of the group joined in. He balled up on the ground to protect his head and face as they kicked him and punched him, putting him in fear for his life. Because of his previous traumatic brain injury, he believed that a blow to the head could have killed him. When he managed to crawl away and push himself to his feet, he saw some of them fighting with K.V., who was also on the ground, and he feared for his brother's safety and life. He went to the car and retrieved his gun in self-defense and to defend his brother. When he leaned into the car to retrieve his gun, he heard a pop—a gunshot—and he ducked down, startled.

Stephens testified, "[I]mmediately after that, you know, I rise up and I shoot towards the group of guys that were jumping my brother." He stated that he had shot over the group—not into the group—so that he would not hit K.V. After he fired, "[e]veryone start[ed] running," and chaos ensued. K.V. got up, and they both got into the car; he did not see Reagler anywhere, so they left because the red Charger had pulled off, and he did not know if it would be coming back. They drove to a friend's nearby house, where he tried to call Reagler but received no answer. He learned later that evening from social media that he was being accused of murder.

Stephens stated that he did not know D.T., had no "beef" with him, and had not been trying to shoot him. When he saw on social media that he might have killed

13

someone, "the doubt did cross [his] mind where maybe that did happen." During his direct examination, he testified as follows:

> Q. So when you learned this, tell us what -- well, tell us what happened to the gun.
>
> A. So once I learned that, I threw it in the dumpster. Really can't tell you where. I just got rid of it.
>
> Q. Do you wish you had the gun now?
>
> A. Yes.
>
> Q. Why?
>
> A. So we could see -- so I could prove that I'm not the one who committed this crime.
>
> Q. And you don't know that for sure, right?
>
> A. Right.
>
> Q. But how do you base that thought process upon?
>
> A. Due to the fact where the fight was, where I shot towards, and where, you know, the victim was.

During cross-examination, Stephens denied being part of a gang, stating that he just hung out with them. He acknowledged having known that the 2200 gang was "beefing" with the YIC. He also acknowledged that Robles had the perfect viewpoint to see him fire the gun. He agreed that a gun is a deadly weapon capable of killing someone. He admitted that he had been willing to endanger other people's lives to protect K.V. And he agreed that pointing a gun at someone and pulling the trigger is capable of causing death or serious bodily injury.

Stephens also testified as follows:

> Q. . . . You told your brother what you did, that you think you shot a boy because you're trying to shoot another gang member. You told your dad you murdered somebody, but you were doing it in self-defense because you were trying to shoot another gang member. That's the truth, isn't it?
>
> A. No.
>
> Q. It just happens to be that the people, the other guy who was jumping the barrier over there, just happens to be a rival gang member? Just a huge coincidence; is that right?
>
> A. Yes, coincidences happen.
>
> Q. Especially with you when you're wanting to shoot and kill somebody?
>
> A. No.
>
> Q. You just happened to get rid of the only piece of evidence that could exonerate you, right?
>
> A. Right.

Stephens claimed that he did not recall telling K.V. that he thought he had shot "that boy." He stated that he had not told his father that he had murdered someone in self-defense, stating, as to his father's bond-hearing testimony, "Maybe you got his words mixed up. Maybe he got his words mixed up." On redirect examination, he stated that he had told his father, "[B]asically along the lines of it was a fight and I got jumped and I know I shot in self-defense. I know I shot my gun."

During the two 911 calls published during the defense's case, one caller reported at 7:06 p.m. that "[s]omebody in a red Dodge Charger is shooting," and "They shot

15

somebody and then they came back again."[10] The other 911 caller reported "several shots fired" at Hurricane Harbor, said that one person had been shot, and stated that some people in a four-door white car[11] had started shooting out into the crowd and were coming back.

The trial court also admitted into evidence another ten 911 calls, offered by the defense to support its theory that Detective Williams's investigation had been deficient after he testified that he did not listen to any of them. These calls were not published during trial, but the jury's first of six notes was to request all "911 calls," photos, and videos. We summarize below the calls' pertinent contents in chronological order.

Just after 7 p.m., a 911 caller reported a shooting "right outside the entry gates" at Hurricane Harbor, stating, "The fight broke out, they were shooting, and they shot this kid literally right in front of me." She described the shooter as "a black male, early to mid-twenties," and said that there had been a red Charger and that the other vehicle looked like a Chevy but that it had not been a drive-by shooting. The caller then reported that the red Charger had returned, and she described the scene as a "madhouse." She stated that the shooter had been outside of the car and that all of the

_____

[10]As noted above, during the State's case, Detective Williams stated that no gunshot residue was found on the four people in the red Charger.

[11]Simpson testified during the State's case that Stephens's car had been "a type of gray or like cream-colored car," but the photographic and other evidence showed that it was a four-door black Chevy Malibu.

16

boys—four to ten of them—had been fist-fighting in a "massive" fight when "a guy pulls out a gun, and he just literally points and shoots, and it[']s literally a ton of people, and this kid gets shot in the back." She described the shooter as probably a little older than seventeen or eighteen and estimated that he had been approximately 5'8 and 230 pounds.[12] She did not know if he had been involved in the fight and was unable to describe the gun "because the sun was behind him" and shining in her face.

At 7:17 p.m., a 911 caller gave "the license plate of the car"—the red Charger— "that like some people got out of" who had been involved in the fight before she heard a gunshot. She stated that some of the combatants had walked out of the park, and three others had gotten out of the Charger, for around eight to ten people in that group. The shot came from the parking lot, and she knew that the red Charger's people had been involved in the fighting but did not think that the shot had come from them.

Other callers—at 7:06 p.m., 7:16 p.m., 7:19 p.m., 7:20 p.m., 7:21 p.m., and 7:23 p.m.—reported one or more gunshots but had no additional information.

At 9:24 p.m., a 911 caller reported that she thought she might have seen the vehicle that sped away after the shooting when she was taking a cigarette break outside the hotel where she worked. She described the vehicle as a burgundy four-door sedan— a Nissan or Toyota—with tinted windows and containing "three or four black guys"

---

[12]Photos of Stephens admitted during the State's case matched this description. The jury also assessed his physical appearance during the trial.

who appeared to be "between the victim's age and probably 21." She said the vehicle did a U-turn and then sped away.

At 10:01 p.m., a caller stated that she had seen the request for information about the Hurricane Harbor shooting on the news and said that her son had seen the incident when he was there picking up her daughter from work. She had been on the phone with him at the time of the incident and overheard it. She had heard yelling in the background and then heard a car honk and what sounded like a car's backfire. That was when her son shouted, "Oh my God, someone just got shot, Mom!" He described the scene to her: a red or maroon Charger that sped off but stayed in the parking lot and a black car that sped off. All he saw of the shooting, however, was "the person falling over," not the shooter.

## C. Applicable law

In a two-paragraph indictment, the State charged Stephens with having, on or about June 23, 2021, (1) intentionally or knowingly caused D.T.'s death by shooting him with a firearm, *see* Tex. Penal Code § 19.02(b)(1), and (2) intentionally, with the intent to cause serious bodily injury to D.T., committed an act clearly dangerous to human life, namely, shooting D.T. with a firearm and thereby causing his death, *see id.* § 19.02(b)(2). In the jury charge, the trial court included instructions on transferred intent, *see id.* § 6.04(b), self-defense, *see id.* §§ 9.31–.32, and defense of others, *see id.* § 9.33.

"A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." *Id.* § 6.03(b). Further, "[a] person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.*; *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) ("[A]ppellant is guilty of murder because he was aware that firing an automatic weapon into a crowd of people was, by the nature of the conduct, reasonably certain to result in death."). A jury may infer intent or knowledge from any facts that tend to prove its existence, including the accused's acts, words, and conduct; the method of committing the crime; and the nature of the victim's wounds. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Reyes v. State*, 480 S.W.3d 70, 77 (Tex. App.—Fort Worth 2015, pet. ref'd) (stating that "[a] jury may infer the intent to kill from any evidence that it believes proves the existence of intent, including the accused's use of a deadly weapon," and that it may infer intent or knowledge from circumstantial evidence such as the defendant's acts, words, and conduct); *see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (stating that an attempt to conceal incriminating evidence is a circumstance of guilt); *Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) ("Flight is circumstantial evidence from which a jury may infer guilt.");

*cf. Miranda v. State*, 620 S.W.3d 923, 928 (Tex. Crim. App. 2021) (explaining that a defendant's extrajudicial confession does not constitute legally sufficient evidence of guilt without corroborating evidence independent of that confession showing that the "essential nature" of the offense was committed).

As to transferred intent, a person is "criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that . . . a different person . . . was injured, harmed, or otherwise affected." Tex. Penal Code § 6.04(b)(2); *Bell v. State*, 169 S.W.3d 384, 396 (Tex. App.—Fort Worth 2005, pet. ref'd) (explaining that under Section 6.04(b), a defendant can be "criminally responsible" for another's death "if he actually caused the victim's death while acting with the intent to kill a different person, even if he did not intend to kill the actual victim" and that transferred intent is an issue to be determined in the trial's guilt–innocence phase).

Self-defense and defense of others are legal justifications excusing otherwise criminal conduct. *See* Tex. Penal Code §§ 9.02, .31–.33. With exceptions, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). A person is justified in using deadly force against another "if the actor would be justified in using force against the other under Section 9.31[] and . . . when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or

attempted use of unlawful deadly force." *Id.* § 9.32(a)(1), (a)(2)(A). A person is justified in using force or deadly force against another to protect a third person

> if (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

*Id.* § 9.33. In the self-defense and defense-of-others context, force that is "immediately necessary" is force that is needed at that moment—"when a split[-]second decision is required"—to avoid harm that is near at hand. *Henley v. State*, 493 S.W.3d 77, 89–90 (Tex. Crim. App. 2016).

Self-defense is a confession-and-avoidance defense requiring the defendant to admit to his otherwise illegal conduct. *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). After a defendant has introduced some evidence of self-defense or defense of others, the State bears the burden of persuasion to disprove it. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *Zuliani v. State*, 97 S.W.3d 589, 594 & n.5 (Tex. Crim. App. 2003). The State's burden does not require it to introduce evidence disproving the defenses; rather, it requires the State to prove its case beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 608. To determine evidentiary sufficiency to disprove a self-defense or defense-of-others theory, we ask whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and

also would have found against the appellant on one of the defensive issues beyond a reasonable doubt. *Id.* at 609; *see Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. When a jury finds the defendant guilty, there is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594.

**D. Analysis**

The evidence listed by the State is sufficient, when viewed in the light most favorable to the verdict, to determine that the jury could have found beyond a reasonable doubt that Stephens had either intentionally or knowingly caused D.T.'s death by shooting him or that he had intentionally, with the intent to cause serious bodily injury to a third person, committed an act clearly dangerous to human life, namely, shooting D.T. with the firearm and thereby causing his death. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Metcalf*, 597 S.W.3d at 855; *Jones*, 944 S.W.2d at 647. When combined with the remaining evidence above, viewed in the same light, the evidence is sufficient for the jury to have resolved any conflicting inferences to overcome Stephens's self-defense and defense-of-others theories, *see Braughton*, 569 S.W.3d at 608–09, and to support the transfer of Stephens's intent to cause serious bodily injury from one member of the opposing side of the fight to another or to a bystander—either of which the jury could have reasonably found D.T. to be. *See Edward*, 635 S.W.3d at 656; *Metcalf*, 597 S.W.3d at 855; *see also* Tex. Penal Code § 6.04(b); *Bell*, 169 S.W.3d at 396.

As the exclusive judge of the witnesses' credibility, the jury could have reasonably inferred Stephens's intent to kill from his use of a deadly weapon and his awareness that firing a gun in a crowded area—like Hurricane Harbor at closing time on a summer evening, as illustrated by the surveillance videos and 911 calls—could have resulted in death. *See Jones*, 944 S.W.2d at 647; *see also Medina*, 7 S.W.3d at 640. The jury could have likewise concluded that his flight and disposing of the weapon were evidence of guilt and that these acts corroborated his statements about the shooting to his brother and father. *See Guevara*, 152 S.W.3d at 50; *Kirk*, 421 S.W.3d at 781; *see also Miranda*, 620 S.W.3d at 928. Accordingly, we overrule Stephens's sole issue.

## III. Conclusion

Having overruled Stephens's sole issue, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  June 18, 2026

23