

NUMBER 13-15-00145-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JESUS RIVERA,                                                              Appellant,

v.

THE STATE OF TEXAS,                                                        Appellee.

**On appeal from the 144th District Court
of Bexar County, Texas.**

# MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Longoria
Memorandum Opinion by Justice Garza**

A jury found appellant, Jesus Rivera, guilty of murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02(b), (c) (West, Westlaw through 2015 R.S.). The jury assessed punishment at sixty-six years in prison. By a single issue, Rivera contends the evidence is insufficient to support the jury's rejection of his claim that he acted in self-defense. *See id.* §§ 9.31, 9.32 (West, Westlaw through 2015 R.S). We affirm.

## I.  BACKGROUND[1]

Appellant admits that he killed the victim, Ryan Yearley, by shooting him with a shotgun.  Appellant contends, however, that he acted in self-defense because Ryan came toward him with an open pocketknife.  We have summarized below the relevant testimony regarding the events surrounding Ryan's death.

Jose Alfredo "Frijol" Torres testified that he is appellant's friend and has known him for three or four years.  For about four months in 2012, Torres and appellant lived in San Antonio, Texas, in a "back house" on property owned by appellant's father.  Appellant's sister, Maria Rivera, lived in the "front house" with her boyfriend, Ryan, and their infant son.

In 2012, on the day before Thanksgiving, Torres was at the front house with Ryan and Maria.  Appellant was at the Academy store purchasing a 12-gauge shotgun; appellant wanted the firearm for self-protection against some gang members who had assaulted him.  Torres testified he was not comfortable with appellant purchasing a gun because appellant had a bad temper and was easily angered.  For example, on one occasion, appellant cut Torres's hand with a knife because Torres had borrowed appellant's car without his permission.  On the night before Thanksgiving, Torres, Ryan, and appellant were smoking "Klimax."[2]  Torres left around 8:30 p.m. because Ryan was becoming belligerent.

The next morning, Thanksgiving Day, Torres was awakened at his apartment

[1] This case is before this Court on transfer from the Fourth Court of Appeals in San Antonio pursuant to an order issued by the Texas Supreme Court.  *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2015 R.S.).

[2] The record reflects that Klimax is synthetic marijuana.

around 7:00 a.m. by a telephone call from appellant. Appellant asked Torres to come to the house because "something had happened." When Torres arrived, appellant was sitting on the couch with a shotgun. Appellant told Torres to look in the bathroom; Torres saw Ryan's dead body lying on the bathroom floor. Because appellant still had the shotgun, Torres was afraid that appellant may shoot him. Appellant said they had to get rid of Ryan's body and that "no one has to know." Appellant and Torres cut out the springs and insides out of a mattress, and placed Ryan's body inside the mattress cover. They carried Ryan's body to the back house and placed it inside a bathtub. Appellant told Torres that he could "disappear" if he told anyone about the incident.[3]

Appellant and Torres returned to the front house, smoked Klimax, and played video games. Torres attempted to comfort Maria; she was afraid of appellant. Appellant did not tell Torres what happened and did not tell him that he had killed Ryan in self-defense. Neither Torres nor Maria called the police because they were afraid of appellant and did not want him to go to jail.

On cross-examination, Torres admitted that he believed the incident in which appellant cut his hand was an accident and was not intentional. When the incident occurred, appellant apologized repeatedly and took Torres to the hospital for medical care. Torres said that the night before Thanksgiving, Ryan had taken heroin, Xanax, and had smoked Klimax. According to Torres, when Ryan told Torres to leave that night, he "said in an angry way, Nigger, leave." Ryan had used that term with Torres on other occasions, when Ryan had been drinking.

---

[3] Both Torres and Maria were given immunity in exchange for their testimony.

3

Torres testified that after he and appellant carried Ryan's body to the back house, they walked to Jorge "Orlando" Torres's house and talked with him. After they returned, Torres caught the bus and returned to his apartment.

Maria testified that prior to Ryan's death, she had been alone at home with the baby and had heard noises in the hall, which frightened her. The night before Thanksgiving 2012, her father took appellant to Academy to buy a shotgun. Maria was uncomfortable with appellant having a gun in the house because he had a bad temper. On one occasion, appellant had punched holes in the wall and had broken a window in the back house because Ryan and a cousin had smoked some of appellant's Klimax.

On the night of Ryan's death, Ryan, appellant, and Torres were hanging out on the back patio smoking Klimax. Ryan had also taken pills and consumed beer. Later in the evening, Ryan and Maria went to bed. The baby was also in the bed. At some point, Maria woke up and Ryan was not in the bedroom. She found him and appellant in the living room smoking Klimax and watching television. They were not fighting or bickering. She did not see a shotgun or a knife. Maria asked Ryan to return to bed, but he did not. Maria returned to bed, but did not go to sleep right away. A short while later, she heard a gunshot and heard appellant laughing. As she got up, appellant came to the door of the bedroom and said, "I'm going to do you next." Maria went into the living room and saw Ryan's body on the floor. She did not see any knife or gun. Appellant went into her bedroom and went to sleep on the bed.

According to Maria, at some point, appellant woke up and ordered her to clean up Ryan's blood. She used Clorox and towels to clean the carpet. Maria did as appellant directed because she was afraid he would shoot her. Appellant said that they would tell others that Ryan had gone out drinking the night before and had not returned. Appellant

4

moved Ryan's body into the main house bathroom and called Torres to come over.

Maria testified that appellant also threatened Torres, but she was not present when that occurred. Appellant asked Maria to hide Ryan's knife that he usually carried on his waist and his lighter so it would appear that Ryan had taken the items with him when he left the house. When Torres arrived, he and appellant removed the insides of a mattress, placed Ryan's body inside the mattress cover, and moved the body to the back house. Maria said that appellant planned to cut up Ryan's body and throw the pieces into the river. While appellant and Torres were carrying Ryan's body to the back house, Maria hid the shotgun so appellant would not have access to it.

Later that morning, Ryan's mother came to the house. Appellant was on the couch playing video games. Maria and the baby went with Ryan's mother to celebrate Thanksgiving with family. Maria told Ryan's mother that Ryan had not come home the previous night. Maria did not call the police because she was afraid.

When they returned to the house, Maria's parents had arrived. Appellant was on the couch sleeping. Maria talked to her parents on the back patio and told them about Ryan's death; together, they called the police immediately. Ryan's mother had left the house briefly to look for Ryan; when she returned, the police were at the house. By the time the police arrived, appellant had left the house.

According to Maria, before Ryan's death, Maria had wanted to end her relationship with Ryan. She wanted him to move out, but he wanted to continue the relationship. On one occasion, appellant asked Maria what she would do if he killed Ryan.

On cross-examination, Maria admitted that she had once seen Ryan use a knife in a threatening manner by making slashing gestures. Before moving into the house, when she and Ryan lived in an apartment, Ryan had broken the door at the apartment, punched

5

holes in the wall, and had occasionally hit her. Ryan often consumed Xanax and beer, a combination of substances that made him aggressive. He also sometimes consumed cocaine. During the evening the night of his death, Ryan left the house and went across the street to a neighbor's house. When he returned, Maria could tell that Ryan had consumed Xanax and beer.

Earlier in November, Ryan had overdosed on methamphetamine and had a seizure. A neighbor helped to save his life. Maria had asked Ryan to leave the house on a couple of occasions, but he had not done so. Because Maria was not working, she was dependent on Ryan for her support. She and Ryan had written an agreement providing for shared custody of the baby and for Ryan to pay Maria child support. Maria admitted that Ryan's demeanor could change from calm to angry very quickly. Maria stated that, after Ryan's death, appellant told her that Ryan had a knife and was "acting all bad ass." After the incident in which Maria heard noises in the house, Ryan had attempted to purchase a gun at a pawnshop, but had failed a background check because he was on probation for drug possession.

Hector Armando Hernandez, a neighbor who lived across the street, testified for the defense. On the night before Thanksgiving, Ryan visited Hernandez's house. Ryan consumed Xanax and beer and also snorted some heroin. When Ryan left that night, he was stumbling and had trouble talking. Ryan also consumed cocaine every weekend. One night before the shooting, Ryan was on drugs and became very aggressive with Hernandez. Hernandez did not want to get in a fight and went home.

Joseph Garcia, another neighbor that lived nearby, testified that he saw Ryan drinking at Hernandez's house the night before Thanksgiving. He stated that Ryan had been smoking Klimax that night, but appeared to be sober when he left.

6

Appellant testified that he purchased the shotgun for home protection and in part because Ryan was unable to purchase a weapon. At Maria's request, appellant had been sleeping on the couch in the main house for about a month. On the day before Thanksgiving, appellant's father picked appellant up from work. When appellant arrived at the house, Ryan was consuming Klimax and Xanax. Ryan had about six or seven Xanax tablets in his shirt pocket. Appellant told Ryan that he was planning to buy the gun. Appellant's father picked him up at the house and took him to cash his paycheck. Appellant told his father he wanted to purchase a gun for self-protection; appellant's father opposed the idea of purchasing a gun. Appellant's father recommended purchasing the gun at Academy instead of at a pawn shop.

Appellant testified that he told the clerk at Academy that he wanted a cheap weapon for home protection. Appellant had never fired a gun. Appellant purchased a shotgun and a box of five shells. Appellant did not read the instructions that came with the shotgun. No one showed him how to handle or operate the weapon, and he received no instruction regarding safety precautions. After he arrived at home, appellant loaded the shotgun with one old shell and one new shell. He planned to celebrate the purchase with Ryan by firing the weapon outside.

According to appellant, he joined Ryan and Torres, who were sitting on the patio. Appellant noticed that Ryan was very "messed up" and "drugged out" and was in no condition to handle a weapon. Appellant did not activate the "safety" switch on the shotgun. Appellant had the shotgun with him as he sat on the patio with Ryan and Torres. Ryan asked to see the shotgun, but appellant said "not now." Ryan's mood toward Torres was agitated and confrontational. Torres went home. Ryan also went inside. Appellant collected Ryan's Klimax and glass pipe and took them inside. Appellant put the shotgun

7

under the sofa and went to sleep on the sofa.

Appellant testified that at some point, he awoke and started watching television. Ryan came out of the bedroom and into the living room. Ryan's disposition was even worse than it had been earlier; he was "messed up on Xanax and beer" and had an agitated stare. Ryan demanded to know where his Klimax was; appellant pointed out it was on the coffee table. Ryan aggressively packed a bowl of Klimax and smoked it aggressively, inhaling very strongly. Ryan did not offer appellant a "hit," which was unusual. Because Ryan's failure to share his drugs was unusual, appellant felt there was a problem. Ryan dumped the ashes onto the coffee table and proceeded to pack another bowl. It was very unusual to smoke inside the house because Maria had a rule prohibiting smoking in the house. Ryan smoked the second bowl without offering any drugs to appellant, which had never occurred before. Ryan dumped the ashes from the second bowl onto the coffee table and proceeded to pack a third bowl. Maria came out of the bedroom and asked what they were doing. Maria returned to the bedroom and Ryan smoked a third bowl of Klimax. Appellant had never seen Ryan or anyone smoke three bowls of Klimax in rapid succession. After finishing the third bowl, Ryan began to pack a fourth bowl.

According to appellant's trial testimony, after Ryan smoked a fourth bowl of Klimax, appellant turned off the television and went to sleep on the couch. Appellant awoke to a sound. When he looked up, he saw Ryan's face looking at him about a foot away. Appellant bolted upright. Ryan was clenching a pocketknife in his right hand. Ryan moved toward appellant, throwing slashes toward appellant's face. Appellant tried to lean away from Ryan. Ryan had a menacing stare and looked angry. Appellant leaned down and grabbed the shotgun from under the sofa. Appellant stood up and moved away from

8

Ryan. Ryan moved toward appellant, still clenching the pocketknife. Appellant testified that he chambered a shell into the shotgun, but Ryan continued to move toward him. Ryan was about an arm's length away from appellant and Ryan aimed the pocketknife at the left side of appellant's neck and face. Appellant swung around, threw the gun up, and fired. According to appellant, he felt that he was about to be killed. He did not plan on killing Ryan; he just threw the gun up for protection and shot. Ryan's body was thrown by the force of the blast and landed on the floor. Appellant saw no movement in Ryan's body.

Appellant testified that he opened the door to Maria's room, but she was already at the door. Appellant walked into the bedroom and sat on the bed. He felt sad and confused. After recalling that people would be coming over later in the morning, appellant moved Ryan's body to the bathroom. Appellant attempted to revive Ryan by placing an ammonia capsule under his nose and by splashing water on his face, but there was no reaction. Appellant broke down. He then asked Maria to clean up the blood in the bathroom. Maria suggested cleaning the carpet with a scrubber. When the cleaner failed to remove the bloodstains on the carpet; Maria suggested cutting out the stained piece of carpet with a boxcutter and replacing it with another piece of carpet. Appellant noticed the knife Ryan usually carried in a sheath on his belt and his lighter in the master bathroom. Realizing that Ryan would have taken the items if he had left the house, appellant asked Maria to hide them. He looked in the living room for Ryan's pocketknife, but did not find it. Appellant knew he could not move Ryan's body alone, so he called "Frijol" Torres and asked him to come over.

Torres and appellant used the boxcutter to remove the insides of a mattress from the back house. They put Ryan's body inside the empty mattress cover and moved it into

9

the bathtub in the back house. They also put Ryan's wallet in the bathtub. They then walked to Orlando Torres's house about a mile away and told him what had happened. After they returned to the house, "Frijol" Torres left to catch the bus back to his house.

Eventually, Ryan's mother came by and picked up Maria and the baby. Appellant's parents came by later in the day and brought some food. Appellant pretended to be asleep on the couch in order to avoid talking. Appellant was aware that Maria was talking to their parents. Appellant panicked, knowing that his parents were learning the truth and that the police would come. Appellant went out the back gate and ran toward his grandfather's house. Appellant saw his grandfather sitting in a wheelchair on the porch of the house. Shortly thereafter, the police arrived, and appellant surrendered.

Appellant testified that he and Ryan worked together for awhile and sometimes traveled out of town to military bases together. At one time, appellant loaned his vehicle to Torres, but while in Torres's possession, the car overheated and was no longer operable. After that incident, appellant did not give Torres permission to borrow his car. Appellant looked up to Ryan because he had some skills in taking care of vehicles. Appellant felt that Ryan was "tougher" and acted as appellant's protector. After the shooting, Maria lived with her parents for a short while, then lived with her aunts. Appellant was unaware that Maria planned to separate from Ryan. On one occasion, appellant saw Ryan and Orlando Torres involved in a fight; the dispute began with a verbal argument, escalated into a physical fight, and resulted in Ryan cutting Orlando's leg. About five days before the shooting, appellant and Ryan walked to the store to buy Klimax. On the way, Ryan pulled out his knife and said he planned to attack some homeless people; when he did not see any homeless people, he attempted to stab a dog. On another occasion, Ryan pulled a knife on a stranger at a bus stop. Appellant stopped

10

Ryan from continuing that confrontation.

On cross-examination, appellant said he fired the shotgun to protect himself. The State asked appellant why he encouraged the story that Ryan went out drinking and did not come home instead of telling Maria that he had killed Ryan in self-defense. Appellant responded that he postponed telling the truth to spare Ryan's mother's feelings. Appellant denied that he threatened Maria. Appellant admitted that neither he nor Maria found the pocketknife around Ryan's body. The pocketknife that appellant claimed Ryan attacked him with was found by the police outside on the patio. Appellant denied that he threatened Maria or "Frijol" Torres with the gun. After appellant realized that Maria had told his parents, he ran from the house because he did not want to face Ryan's mother.

Detective Kelly Bender, a crime scene detective with the San Antonio Police Department, testified regarding the videotaping of the crime scene. An open pocketknife was found on the back patio. Scott Coonradt, a San Antonio Police Department officer assigned to the Crime Scene Unit, testified that a writing pen, glove, and pocketknife were recovered from the back patio. Officer Coonradt testified that there was no apparent blood on the pocketknife that was recovered on the back patio.

Timm Angell, a San Antonio Police Department officer assigned to the homicide unit, testified that he was the lead detective in the investigation of Ryan's death. Angell testified that he submitted the pocketknife found on the patio for testing, but no blood was found on the pocketknife. According to Angell, the shotgun blast to Ryan's chest was a "dead center shot," and the muzzle could have been inches away from Ryan's chest. Based on the compact nature of the fatal wound, Angell believed that the shotgun was fired braced at the shooter's shoulder. Officer Angell testified that both of Ryan's hands had blood stains on them, but the pocketknife had no blood on it. Officer Angell testified

11

that if Ryan had been holding the pocketknife when he was shot, one would expect the knife to have blood on it.

Dr. Kimberley Molina, the Deputy Chief Medical Examiner for the Bexar County Medical Examiner's Office, testified regarding the autopsy performed on Ryan's body. Tests revealed the presence of two types of synthetic marijuana in Ryan's system, but did not show the presence of other drugs or alcohol. In Dr. Molina's opinion, the shotgun was fired approximately six feet from Ryan's body. On cross-examination, Dr. Molina admitted that, even if Ryan had taken Xanax eight to ten hours before his death, the drugs may not have been detected by the tests that were performed. Similarly, other drugs such as alcohol and heroin may not have been detectable.

## II.    STANDARD OF REVIEW AND APPLICABLE LAW

By his sole issue, appellant challenges the sufficiency of the evidence to support the jury's rejection of his self-defense claim.

When an appellant brings a sufficiency challenge on the basis of his claim of self-defense, we do not look to whether the State presented evidence that refuted self-defense. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *Valverde v. State*, 490 S.W.3d 526, 528 (Tex. App.—San Antonio 2016, pet. ref'd). Instead, after reviewing all the evidence in the light most favorable to the verdict, we determine whether any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914; *Valverde*, 490 S.W.3d at 528. The jury resolves any conflicts in the testimony and determines the credibility of the witnesses and the weight to be given to their testimony. *See Wise v. State,* 364 S.W.3d 900, 903 (Tex. Crim. App. 2012); *Valverde*, 490 S.W.3d at 529. Our duty is to ensure the evidence the

12

State presented supports the jury's verdict and the State has presented a legally sufficient case of the offense charged. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

As charged here, a person commits murder if he (1) intentionally or knowingly causes the death of an individual, or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1)(2). A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. *Id.* § 9.31(a). A person is justified in using deadly force against another (1) if he would be justified in using force against another under section 9.31 and (2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *Id.* § 9.32(a).

The defendant has the initial burden of producing evidence to raise self-defense, and the State then has the final burden of persuasion to disprove it. *Saxton*, 804 S.W.2d at 914. The State is not obligated to offer evidence refuting a claim of self-defense; rather, the State is required to prove its case beyond a reasonable doubt. *Id.* "Because the State bears the burden of persuasion to disprove a [claim of self-defense] by establishing its case beyond a reasonable doubt, we review both legal and factual sufficiency challenges to the jury's rejection of such a defense under" the legal sufficiency standard. *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). When a fact finder determines the defendant is guilty, there is an implicit finding against the defensive theory. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003).

"As factfinder, the jury is entitled to judge the credibility of witnesses, and can

13

choose to believe all, some, or none of the testimony presented by the parties." *Smith*, 355 S.W.3d at 146 (quoting *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)). The statements of the defendant and his witnesses do not conclusively prove a claim of self-defense. *Id.*

### III. DISCUSSION

Self-defense is a fact issue for the jury to determine. *Saxton*, 804 S.W.2d at 913. Here, Maria, who was present in the next room when the shooting occurred, testified that she heard appellant laughing immediately after the shotgun blast. When appellant came to her bedroom door, he did not say that he had shot Ryan in self-defense. Instead, he threatened to shoot her also. According to Maria, appellant told her to say that Ryan had left the house and had not returned. To add credibility to this story, appellant asked Maria to hide Ryan's knife and lighter.

"Frijol" Torres's testimony was consistent with Maria's. Torres testified that when he arrived at the house and saw Ryan's body, appellant said they had to get rid of the body and that "no one has to know." Appellant threatened that Torres could "disappear" if he told anyone about the shooting. Appellant did not tell Torres that he killed Ryan in self-defense.

The only evidence that appellant shot Ryan in self-defense was appellant's own testimony, which the jury could have rejected. *See Valverde*, 490 S.W.3d at 529 ("In our review, we defer to the jury's assessment of the credibility of the witnesses, and the jury in this case could have disbelieved Valverde's testimony."). No other evidence supported appellant's version of events. The pocketknife appellant claimed that Ryan threatened him with was found outside on the patio. The pocketknife did not have any traces of blood on it, even though there was blood on both of Ryan's hands. Finally, the jury was entitled

14

to consider appellant's actions in leaving the scene as soon as he realized that the police had been called. *See id.* (citing *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (noting "factfinder may draw an inference of guilt from the circumstance of flight"); *Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) (referencing flight from scene as evidence jury could consider in rejecting self-defense claim)).

Having reviewed all of the evidence in the light most favorable to the prosecution, we conclude the jury rationally could have found each element of the offense was proven beyond a reasonable doubt, and rationally could have rejected appellant's self-defense claim. *See id.* at 528. We overrule appellant's sole issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
1st day of December, 2016.