

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-17-00834-CR

Michelle **CHASE**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CR4377
Honorable Jefferson Moore, Judge Presiding

Opinion by:     Luz Elena D. Chapa, Justice

Sitting:        Luz Elena D. Chapa, Justice
                Beth Watkins, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: June 5, 2019

AFFIRMED

Michelle Chase was convicted by a jury of murder and sentenced by the trial court to forty-five years' imprisonment. The sole issue presented on appeal is whether the evidence is legally insufficient to support the jury's rejection of Chase's claim that she acted in self-defense. We affirm the trial court's judgment.

### BACKGROUND

On February 7, 2016, Officer Matthew Flores was dispatched to the scene of a murder. The body of the victim, William Farr, was found in front of Chase's apartment. Farr was deaf. A

note containing the word "sorry" was beside Farr's body, and he had a pen in his hand. Officer Flores recalled responding to a call at the same location about a year earlier during which time he communicated with a deaf man by written notes. In response to that call, this man was told to leave the premises because his presence was unwanted. Officer Flores testified the man was not aggressive and simply walked off.

At the scene, Chase initially told Officer Flores she last saw Farr over a year ago but later told him she saw Farr every other Sunday. Chase told Officer Flores that Farr would stay with her when he needed a place to stay. Officer Flores noticed Chase would not give him a direct answer to his questions. Chase did not tell Officer Flores that Farr was violent. Officer Flores also spoke with Will Palmer, another resident of the apartment complex, who told Officer Flores he saw Farr and Chase together around 10:30 p.m. the prior night.

Sergeant Buddy Branham was assigned to assist Detective Ruben Perez, the lead detective on Farr's murder case. Sergeant Branham observed portions of Detective Perez's first interview of Chase during which she stated she had no knowledge of what happened and denied any involvement in the shooting. After Chase decided to terminate the interview, Detective Perez and Sergeant Branham drove Chase to her godfather's house. During the drive, Sergeant Branham testified Chase continued to speak to Detective Perez, and Sergeant Branham believed Chase was trying to steer the investigation toward two men. Upon arriving at the home of Chase's godfather, Chase and Sergeant Branham exited the car. Sergeant Branham told Chase she needed to be truthful and explain what had happened at that time rather than delay. When Sergeant Branham then asked Chase if she had shot Farr, she replied she had shot him. At that time, Chase was driven back to the police station and given a second opportunity to provide a statement. During her second interview, Chase provided details about where certain evidence could be found, including the gun Chase used to shoot Farr. Sergeant Branham testified Chase went to a lot of effort to hide the bag

containing the gun because it was buried under several bags of clothing in her closet. Despite an extensive search, Sergeant Branham testified they were unable to find the shell casing from the shot that was fired that ultimately killed Farr.

Will Palmer, the resident of the apartment complex who initially spoke with Officer Flores, testified he saw Chase the night of February 6, 2016, around 10:30 or 11:00 p.m. when he pulled into the complex's parking lot. The light in Chase's truck was on, and Palmer saw her going through her truck while Farr was standing next to a nearby tree. Palmer stated Chase did not appear scared or nervous, and Chase and Farr were not interacting with each other. Palmer went inside his apartment and never heard anyone scream. Palmer described Farr as a "laid back type of guy" who was not rowdy or violent. Palmer testified he saw Chase and Farr together on a regular basis, and Chase never appeared to be afraid of Farr. Palmer testified he believed Farr was living with Chase.

Detective Perez made contact with Chase at the scene after he spoke with Officer Flores. Chase told him she met Farr around 2012. Chase also told Detective Perez that she saw Farr twice on February 6, 2016, and the second time she suggested that he come home with her because he was hanging around with bad people; however, Farr told her to mind her own business. Chase then told Detective Perez she went to her godfather's house around 5:00 or 6:00 p.m. where she stayed the rest of the night. She discovered Farr's body on the sidewalk in front of her apartment when she returned home the following morning. Detective Perez then spoke with Palmer who told him he had seen Chase and Farr together around 10:30 p.m. on February 6, 2016. When Detective Perez confronted Chase with that information, she was initially evasive but then stated she left after Palmer saw them, and other people were nearby when she left.

The following morning, the autopsy results revealed Farr had a bullet wound to his chest that neither Detective Perez nor Officer Flores noticed at the scene. Dr. Rajesh Kannan, a deputy

medical examiner, testified the gunshot made a hole through Farr's heart, causing extensive bleeding inside his chest. Upon returning to Chase's apartment, Detective Perez looked closely at the screen door and noticed a hole that was consistent with a bullet going through the screen. Christina Vachon, a forensic scientist, testified gunshot residue on the screen door to Chase's apartment was evidence that the screen door came in contact with or was in close proximity to a discharging firearm.

Detective Perez testified Chase voluntarily went to the police station on February 8, 2016, to be interviewed, and during the interview, she continually referred to other people who might have been involved in Farr's death. When Detective Perez asked Chase if she had any weapons, she denied ever owning a gun, and she refused to consent to a search of her apartment. As Detective Perez drove Chase to her godfather's house following the interview, Chase continued to repeat Farr hangs out with bad men. After arriving at Chase's godfather's house, Detective Perez started to complete the consent-to-search paperwork of Chase's cell phone when he heard her say she wanted to go back to the station to provide a second statement. While she gave the second statement, Chase consented to a search of her apartment.

Based on the investigation, Detective Perez obtained a warrant for Chase's arrest. After she was arrested, Chase provided a third statement which Detective Perez described as being inconsistent with her prior statements. Detective Perez testified based on his investigation, Chase stated she did not call anyone after she shot Farr. But when confronted with the cell phone records that showed multiple phone calls, Chase stated she kept her phone in her bra, and it must have dialed itself. Based on his investigation, Detective Perez testified he did not believe Chase acted in self-defense because people who act in self-defense immediately explain what happened to the police.

Michelle Smith, Chase's daughter, lived with Chase for about a year but moved out a few months before the shooting. Smith described Farr as "pretty chill" but stated things would "get difficult" between Chase and Farr when Farr would drink excessively. Smith testified Farr broke the windows of Chase's truck on one occasion.

At trial, Chase testified she knew Farr for a year to a year and a half but denied that Farr lived with her or ever spent the night. Chase testified Farr was aggressive when he was drinking, and she called the police on him three times, including on July 18, 2014, when Farr "busted" the windows of her vehicle. Chase later testified she called the police over ten times when Farr would arrive at her apartment and bang on her door and windows.

On the night Chase shot Farr, she testified she was sitting in her truck in her apartment complex parking lot when Farr hit the truck's window twice with his fist. Farr was drunk and demanded money. Chase stated she tried to run into her apartment, but before reaching it, Farr hit her in the head, knocked her to the ground, and stomped on her arm. Chase testified she was "hollering" but no one helped her. Chase stated she then ran to her apartment and had her keys in the dead bolt when Farr grabbed the screen door and hit Chase two more times in the head. Chase testified Farr also hit her in the center of her back as she opened her door and knocked her down resulting in her upper body lying inside the apartment and her lower body outside. Chase testified Farr kicked her as he entered the apartment and stomped on her head. Chase testified she grabbed a gun from under a chair, turned and fired the gun, and then ran past Farr to her truck "hollering and screaming." Chase stated she then drove to her godfather's house where she stayed the night. When Chase returned to her apartment the following morning, she found Farr's body and called EMS. Chase testified she was not trying to hide the gun she used to shoot Farr.

On cross-examination, the videotape of Chase's first interview was played for the jury. In the interview, Chase told Detective Perez she saw Farr with some "bad" guys when she left her

apartment. She also stated she stayed the night at her godfather's house and discovered Farr's body in front of her apartment the following morning. Chase further stated she did not have a gun in her home. Detective Perez asked for consent to search her phone because the phone's GPS would confirm her location, but Chase refused to give consent. When Detective Perez asked if Chase knew that Farr had a bullet hole in him, Chase denied having any knowledge, stating she "wasn't there." Chase would not consent to a search of her apartment.

When questioned about her first interview during trial, Chase admitted her statements were different from her trial testimony, but she denied lying. She did not recall saying she did not have a gun in her home. Chase testified she did not tell Detective Perez about Farr beating her because Detective Perez told her he did not want to hear it when she initially tried to explain it to him during their first encounter at her apartment. She also stated she was not intending for the police to investigate the "bad guys" she referred to in her interview. When asked whether she told Sergeant Branham that she shot Farr, Chase testified she told him she shot "at" Farr.

The videotape of Chase's second interview was then played for the jury. In her second interview, Chase stated Farr had been aggressive and violent toward her, and she had called the police to report it at least ten times. On the night she shot Farr, she stated she was looking through her glovebox when Farr hit the truck's window. She ran into her apartment and closed the door, but Farr continued to bang on the door. Chase then retrieved the gun from her bedroom closet, opened the wooden door, and shot Farr through the screen door when he would not leave. Chase also stated her godfather pulled a shotgun and ordered Farr to leave his house on a prior occasion when he witnessed Farr being physically violent toward Chase.

On the State's rebuttal, Vernon Barnett, the man Chase referred to as her godfather, testified Farr would spend the night at his house occasionally. He also testified Farr was a lot of help to him and he considered him an excellent friend. Barnett denied ever seeing Farr hit Chase

or ever ordering Farr out of his house at gunpoint. Another of Chase's neighbors also testified Farr was an easy-going person, and Farr's former employer testified he had never seen Farr act violent even when drinking.

After hearing the evidence, the jury found Chase guilty of murder, implicitly rejecting her claim of self-defense.

## DISCUSSION

To prevail on a claim of self-defense with the use of deadly force, a defendant may prove: (1) he would have been justified in using force against the other person; and (2) it was reasonable to believe that "deadly force [was] immediately necessary [for protection] against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a). "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id*. § 9.31(a).

"Once a defendant produces some evidence raising the issue of self-defense, the State bears the burden of persuasion to show beyond a reasonable doubt that the defendant's actions were not justified." *Valverde v. State*, 490 S.W.3d 526, 527-28 (Tex. App.—San Antonio 2016, pet. ref'd) (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991)); *see also Braughton v. State*, No. PD-0907-17, 2018 WL 6626621, at *12 (Tex. Crim. App. Dec. 19, 2018) ("reaffirm[ing] [sufficiency] principles from *Saxton* . . . as providing the proper framework for evaluating a claim of insufficient evidence" in the context of a jury's rejection of a claim of self-defense). "To meet its burden of persuasion, the State is not required to produce additional evidence." *Valverde*, 490 S.W.3d at 528 (citing *Saxton*, 804 S.W.2d at 913). "If the jury finds the defendant guilty, it has made an implicit finding against

any defensive theory raised by the defendant." *Id*. (citing *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 914).

"When a defendant challenges the legal sufficiency of the evidence to support the jury's implicit rejection of his self-defense claim, 'we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.'" *Id*. (quoting *Saxton*, 804 S.W.2d at 914). "In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony." *Id*. (citing *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)).

In arguing the evidence is legally insufficient to support the jury's implicit rejection of her claim of self-defense, Chase focuses on her testimony at trial regarding the events preceding the shooting. Based on the evidence presented, however, the jury could have found Chase's testimony not credible. First, Chase's testimony was inconsistent with her statements to the police. Second, Chase hid the murder weapon and fled the scene of the offense. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (recognizing "factfinder may draw an inference of guilt from the circumstance of flight"); *Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) (referencing flight from scene as evidence jury could consider in rejecting self-defense claim). Third, Chase's testimony regarding Farr's character was inconsistent with the other witnesses' testimony, including the man she referred to as her godfather. Finally, Palmer saw Farr and Chase in the parking lot on the night of Farr's murder and did not witness any altercation. Accordingly, the jury, as the sole judge of the credibility of the witnesses, could have disbelieved Chase's testimony at trial. Therefore, viewing all the evidence in the light most favorable to the

prosecution, we hold any rational trier of fact could have found against Chase on the self-defense issue and found the State proved all the essential elements of the murder offense beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914; *Valverde*, 490 S.W.3d at 528.

**CONCLUSION**

The trial court's judgment is affirmed.

Luz Elena D. Chapa, Justice

DO NOT PUBLISH