COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| ZACHARY CARTER, | § | No. 08-22-00151-CR |
| Appellant, | § | Appeal from the |
| v. | § | Criminal District Court No. 1 |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20210D01533) |

**MEMORANDUM OPINION**

A jury convicted Appellant Zachary Carter of murder for shooting Joseph Jimenez. Appellant argues one issue on appeal: the evidence is legally insufficient to support his conviction because the State failed to disprove he acted in self-defense. For the following reasons, we affirm Appellant's conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pre-shooting events

Many facts in this case are undisputed. Peter Garcia testified that Jimenez was a friend with whom he would occasionally smoke marijuana. Garcia claimed Appellant, whom he knew as "Z," regularly sold Jimenez marijuana, although Appellant claimed he did not sell marijuana to Jimenez

or Garcia. On February 20, 2020, Jimenez and Garcia were at Jimenez's father's house when Jimenez contacted Appellant about coming over. Appellant brought Joseph Banda and two females to the house. Garcia recalled that the group smoked marijuana together, and the females appeared to be under the influence of Xanax, which Banda and Appellant also had with them. Appellant and Banda left at about midnight, and Garcia left a few hours later.

On the evening of February 21, 2020, Appellant was driving his Mustang with four individuals: Banda, D.N.[1] (or Milly), Danielle Martinez, and "Rosalie." According to Martinez, while they were in a parking lot discussing plans for the evening, Banda told Martinez somebody had taken $800 to $1,100 from him and he was going to pick up the money. Martinez testified that Appellant, Banda, and D.N. were consuming vodka straight out of a bottle, and the entire group was smoking marijuana. Appellant denied consuming alcohol or marijuana while he was driving. Martinez stated Appellant and Banda seemed "hyper," and Appellant appeared to be feeling the effects of the alcohol as he was "driving [and] switching lanes pretty fast."

Garcia testified that at 7:00 or 8:00 that night, he and Jimenez had plans to go to a party, and Jimenez texted Appellant to purchase more marijuana. Appellant typically parked his Ford Mustang by the side or in front of Garcia's house. But this time, when Appellant arrived at Garcia's house approximately 25 minutes later, Appellant parked his Mustang in front of a house several houses away from Garcia's. Banda was in the front passenger seat and the remaining individuals were in the rear passenger seats.

Garcia stated he was apprehensive because Appellant parked at an unusual location and Banda answered the phone. Garcia told Jimenez to stay in his room, but Jimenez came with Garcia

---

[1] Because D.N. was a juvenile at the time of trial, we use his initials to protect his identity. *See* TEX. R. APP. P. 9.10.

2

to meet Appellant anyway. Garcia and Jimenez approached the Mustang, and Banda got out of the front passenger-side seat. Appellant stayed in the Mustang and placed a handgun in his lap.

### B.   Testimony regarding the shooting

From this point, the State's witnesses testified with slight variations, while Appellant's version of the events varied in some important details. We recount the testimony of each below.

#### (1)   *Garcia's testimony*

Garcia testified as follows. Banda got out of the Mustang and asked him and Jimenez how much marijuana they needed. Garcia asked for two grams and gave Banda a $20 bill. Banda retrieved a jar of marijuana, gave some to Garcia, and put the jar back in the Mustang. Banda came back and told Garcia Appellant wanted to pay Banda $600 to "drop" (i.e., assault) Garcia. As the State played a video recording of the incident (taken from a nearby house), Garcia recalled Jimenez saying to Banda, "Chill out, bro" and "Don't do my homie like that" and Banda cursing at Jimenez and Garcia. Garcia and Banda began arguing. Banda shoved and tried to trip Garcia then they started fighting. Jimenez shouted at Banda to calm down then jumped into the fight.

After the initial confrontation with Banda, D.N. exited the vehicle and began fighting Garcia, while Jimenez simultaneously began fighting Banda. As the fight continued, Appellant fired multiple rounds from his handgun into the air from inside the Mustang. The fight stopped when Banda and D.N. went back into the Mustang, but Garcia and Jimenez attempted to pull Banda and D.N. out of the vehicle. Garcia and Jimenez went to the driver's side to pull D.N. out of the vehicle, and Appellant was standing at the side of the vehicle near its rear bumper holding the gun at his side and firing twice more. As Garcia and Jimenez tried to pull D.N. out, Jimenez turned toward Appellant. While Appellant and Jimenez were standing facing each other, Appellant shot him once from approximately 79 inches away.

3

Garcia and Jimenez were not reaching into the car when Appellant shot Jimenez, and Appellant "kind of looked at [him] for a couple of seconds before he pulled the trigger on him." Jimenez, who was only wearing basketball shorts, did not have any weapons with him. Garcia denied that he or Jimenez advanced toward Appellant prior to Jimenez being shot. After Appellant shot Jimenez, Appellant sped away in the Mustang, striking the vehicle Garcia's sister was driving, injuring her. Meanwhile, Garcia attempted to aid Jimenez, who was transported to the hospital.

**(2)** *Martinez's testimony*

Martinez testified as follows. On the night of the shooting, she rode with Appellant, Banda, D.N., and Rosalie in Appellant's Mustang. When they arrived at the scene of the shooting, Banda, Garcia, and Jimenez spoke for a few minutes then became aggressive with each other in their tone of voice and body language. Banda began fighting with Garcia, and Jimenez joined in the fight against Banda. Appellant then got out of the Mustang and told D.N. to help Banda, and D.N. joined in the fight. After a few minutes, D.N. got back in the Mustang and Jimenez followed him then began punching him and Martinez inside the car through the window. Appellant was standing next to the car and fired the first shot into the air when Jimenez was punching D.N. in the car. Appellant told Jimenez to back up and stop hitting D.N. and Martinez, and Jimenez ran into the middle of the street and ripped his shirt off. Jimenez came back toward Appellant, who continued to fire more rounds. Martinez did not see Jimenez or Garcia with a weapon; Appellant was the only person with a firearm that night. Martinez did not see Jimenez get shot because she was busy trying to calm Rosalie down, but she overheard Jimenez say something to Appellant before Jimenez fell to the ground.

After Jimenez was shot, Appellant and Banda got back in the Mustang, and Appellant began to drive toward Jimenez and Garcia. Banda told Appellant not to hit Jimenez's body.

4

Martinez believed that Appellant was trying to strike Jimenez's body. Appellant swerved and struck a parked vehicle then swerved the other way, striking a moving vehicle head-on. Appellant continued trying to drive, but the Mustang stopped running after about half a mile because it was too damaged. Everyone except Banda left the Mustang and ran toward a wall, where Appellant and D.N. talked about getting an Uber. The group then scattered, with D.N. and Appellant going one way and Martinez and Rosalie going another way. Banda stayed with the vehicle.

### (3) D.N.'s testimony

D.N. testified as follows. On the night of the shooting, he met up with Appellant and the others and rode with them in Appellant's Mustang. They drove to a neighborhood and parked a couple of houses down from a certain house, from which Jimenez and Garcia emerged. Banda got out of the Mustang and began speaking to the men. The group's conversation was becoming aggressive, and eventually Banda began physically fighting Jimenez and Garcia. Banda asked Appellant to give him the handgun, but Appellant refused and got out of the vehicle with it. D.N. asked Appellant to let him out of the car so he could help Banda fight. D.N. fought with Jimenez and eventually got back into the car after Banda told him to. Jimenez began punching D.N. while D.N. was in the Mustang, and after hearing some gunshots, D.N. saw Jimenez run and fall down. D.N. did not see Jimenez get shot, recalling only that Appellant was armed with a weapon.

Appellant and Banda ran back to the Mustang and Appellant sped off, striking a parked car then a moving car. After a few blocks, the Mustang broke down and D.N. began running away with Appellant, Martinez, and Rosalie. D.N. and Appellant eventually separated from Martinez and Rosalie, and after Appellant and D.N. walked for some time, Appellant approached the driver of a truck for help as the driver was pulling into a residential driveway. The driver, Sergio Valdez, was a detention officer and wearing a sheriff's department hat. Valdez ordered an Uber for

5

Appellant and D.N. after Appellant showed the driver his license to carry a handgun. Appellant and D.N. rode together in the Uber with Appellant, who was concealing his handgun in his jacket. Neither D.N. nor Appellant attempted to call 911. D.N. recalled that while they were at D.N.'s aunt's house, Appellant was arrested after saying, "Love you, man."

### (4) *Christopher Herrera's testimony*

Christopher Herrera, a man who lived in a house next to the scene of the shooting, testified as follows. On the night in question, he was in his house when his son told him someone was shooting fireworks or firing a gun outside. Herrera went outside and heard people arguing and scuffling. Herrera saw a muzzle flash from a firearm Appellant was holding, and he saw Jimenez, holding his chest, trying to run away. Herrera estimated that Appellant was standing approximately 67 inches away from Jimenez when Jimenez was shot. Herrera did not see Jimenez holding a weapon. After Appellant shot Jimenez, Herrera ducked behind his wife's car and heard a car speeding away; Herrera ran after the car trying to get a photograph of the license plate. After Herrera saw the car almost run over Jimenez's body and strike a parked vehicle and a moving vehicle, he ran toward Jimenez and began administering CPR with his son's help.

### (5) *Appellant's testimony*

Appellant testified in his case-in-chief as follows. On the night before the shooting, he and Banda went to a party at Garcia's house. Appellant did not argue or fight with Garcia or Jimenez that night. The following day, Banda messaged Appellant asking if he wanted to go to another party at Garcia's house. When he arrived at Garcia's house, Appellant put his handgun in his lap because he did not want to take it inside Garcia's house. As Appellant did so, Banda told him to not get out of the Mustang yet because he wanted to "talk to someone real quick," and Appellant agreed.

6

As Appellant was scanning for music on the Mustang's radio, D.N. said, "They're going to jump Banda." Because it was dark, Appellant could not see who the men were. Appellant did not initially get out of the car to help Banda because he still had his handgun, an FN Five-seven, on his person.[2] Because he did not want to risk being disarmed during the fight, Appellant sent D.N. to the fight, thinking D.N. could help break it up. Appellant stated he could have left his handgun in the car, but he did not want to leave his weapon with someone that he did not know. D.N. went out to fight the men, but he got scared and tried to avoid being hit. Appellant saw Jimenez, who was acting "[v]ery aggressive[ly]," rip his shirt off, and saw Garcia chase after D.N. Appellant told everyone to "just stop," but because nobody paid attention, Appellant fired one round into the air hoping to stop the fight. The fight got worse, so Appellant fired another round. Appellant told D.N. to get in the Mustang, and D.N. got in with Jimenez in pursuit. Appellant, who was standing by the vehicle's door, moved out of the way so D.N. could get in. Seeing Jimenez and Garcia chasing D.N., Appellant fired another two rounds into the air hoping to discourage Jimenez and Garcia from coming closer. D.N. got into the Mustang, and Jimenez and Garcia reached in and began punching him.

At this point, Appellant was concerned that Garcia and Jimenez were undeterred by the warning shots and were possibly going to drag D.N. out of the Mustang and beat him. Appellant saw Garcia reaching for the car door, and Appellant decided to aim his handgun at Garcia and Jimenez so they would take the warning more seriously, but Appellant was "not thinking [he was] going to shoot at that time." Garcia backed away, but Jimenez, who was approximately six or seven feet away, looked at Appellant with a "scary" look of "rage" in his eyes. Appellant hesitated

---

[2] According to Appellant, he had a valid License to Carry a Handgun issued by the State of Texas at the time of the shooting and would carry his handgun "[m]ost of the time."

to shoot, but when Jimenez turned and "lunge[d] forward" at him, Appellant fired. Appellant, relying on his training as a former Army infantryman, aimed at Jimenez's center mass. Appellant was afraid for his life and for the lives of the Mustang's occupants when he fired his handgun, and he was particularly concerned that Jimenez was attempting to pull D.N. out of the vehicle to continue to beat him, as Jimenez was saying "[g]et your ass out of the car." Appellant acknowledged he did not see anybody else with a weapon. Jimenez started running away, and Appellant was relieved because he thought he did not kill Jimenez.

Concerned the incident was not over and Garcia could grab a weapon, Appellant immediately got into the Mustang with a plan to call the police to report the incident from somewhere else. Appellant drove away from the scene but did not remember striking two vehicles because he was emotionally overwhelmed. When the Mustang stopped running, Appellant bailed out of the vehicle and, still not feeling safe, took off running with D.N., Martinez, and Rosalie. Appellant and D.N. became separated from Martinez and Rosalie and eventually flagged down the driver of a truck (Valdez). Appellant showed Valdez his driver's license, but Valdez became upset when he saw Appellant holding a handgun. After Appellant showed Valdez his license to carry a handgun, Valdez went inside his house and did not return, so Appellant rang the doorbell and Valdez came back outside and ordered them an Uber. Appellant did not tell Valdez he had shot someone because he was "in shock," but Valdez asked him about the shooting and Appellant admitted he was involved. Appellant did not want his children witnessing his potential arrest, so he agreed to have the Uber take him and D.N. to D.N.'s house. Two or three minutes after arriving at D.N.'s house, police arrived and arrested Appellant and D.N.

Appellant denied he had ever sold Garcia or Jimenez marijuana and denied he was drinking vodka or smoking marijuana while he was driving. Appellant also denied offering Banda money

to assault Garcia. Appellant admitted he did not call anyone to help Jimenez but stated he reported the incident to Valdez, whom he considered to be law enforcement. Appellant denied he intended to hide from law enforcement.

### C. Post-shooting events

Officer Valdez testified that Appellant was holding a handgun and seemed nervous when he first saw Appellant. Appellant asked for a ride, telling Valdez "they just needed to get away." After Appellant and D.N. hugged and thanked Valdez and left in the Uber Valdez had ordered, Valdez called 911 to report the incident and confirmed that a black male had been one of the men at his house. Valdez provided the dispatcher the address to which he had sent the Uber. El Paso Police Officers Albert Gomez and Ricardo Rodriguez were dispatched to that address. When the officers made contact with Appellant and D.N. and began patting them down for weapons, Officer Gomez asked Appellant if he had any weapons on his person, and Appellant, shaking, denied that he had a firearm on his person. Officer Gomez felt a handgun in Appellant's jacket, removed the handgun, and handcuffed Appellant. Officer Rodriguez recalled that Appellant's eyes were "wide open" and teary when he was arrested.

Dr. Mario Rascon, a forensic pathologist who performed an autopsy on Jimenez, testified Jimenez died from a bullet wound that penetrated his heart and right lung. Dr. Rascon opined that Jimenez's manner of death was homicide.

### D. Procedural history

The State of Texas charged Appellant with one count of murder, alleging alternately (1) Appellant, with the intent to cause serious bodily injury to Jimenez, committed an act clearly dangerous to human life that caused Jimenez's death by shooting him with a firearm; (2) Appellant intentionally or knowingly committed or attempted to commit an act clearly dangerous to human

9

life by shooting Jimenez that caused his death while Appellant was in the course of intentionally or knowingly committing the felony offense of robbery; and (3) Appellant intentionally and knowingly caused the death of Jimenez by shooting him with a firearm. At trial, Appellant raised the affirmative defenses of self-defense and defense of a third person, and the jury charge contained instructions on those claims.

The jury found Appellant guilty of murder and assessed punishment of 23 years' imprisonment and a $10,000 fine. This appeal followed.

## II. DISCUSSION

Appellant challenges his conviction in one issue, arguing the State failed to disprove beyond a reasonable doubt his claims of self-defense and defense of a third party.

### A. Standard of review

The Fourteenth Amendment's due process guarantee requires that legally sufficient evidence support every conviction. *See Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). In a legal-sufficiency challenge, we focus solely on whether the evidence, when viewed in the light most favorable to the verdict, would permit *any* rational jury to find the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 318–19; *Brooks*, 323 S.W.3d at 912 (establishing legal sufficiency under *Jackson v. Virginia* as the only standard for review of the evidence).

In employing this standard, we recognize the jury is the sole arbiter of witness credibility and the weight attached to witness testimony. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). Only the jury acts "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

10

inferences from basic facts to ultimate facts[.]" *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Jackson*, 443 U.S. at 319). In doing so, the jury may choose to believe or disbelieve any testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination. *Dobbs*, 434 S.W.3d at 170 (citing *Jackson*, 443 U.S. at 319). In conducting a legal-sufficiency review, "[w]e are not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt[.]" *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex. Crim. App. 1988) (en banc) (emphasis omitted). Instead, "we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 318).

We consider the sufficiency of the evidence by measuring it against the hypothetically correct jury charge, which "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Ramjattansingh v. State*, 548 S.W.3d 540, 546 (Tex. Crim. App. 2018) (citation omitted).

When a defendant raises a self-defense or defense of a third person claim that justifies his use of force, he bears the burden to produce evidence supporting the defense. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). The burden of production is to "adduce some evidence that would support a rational finding in his favor on the defensive issue." *Id.* Once the defendant produces evidence supporting the defense, the State bears the burden of persuasion to disprove the raised issues. *Id.* The burden of persuasion "is not one that requires the production of

11

evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Id.* (citation and quotation marks omitted).

In a review of the sufficiency of the evidence pertaining to self-defense and defense of a third person, we do not look to whether the State produced evidence refuting the defendant's claim, "rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and would also have found against [A]ppellant on the self-defense issue beyond a reasonable doubt." *Id.* Self-defense and defense of third persons are issues of fact for the jury to decide, and when a jury renders a finding of guilt, it is implicitly rejecting the defense. *Id.*

### B. Law of self-defense

Under Texas law, self-defense is defined as follows.

[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. The actor's belief that the force was immediately necessary as described by this subsection is presumed to be reasonable if the actor:

(1) knew or had reason to believe that the person against whom the force was used:

    (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;

    (B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or

    (C) was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery;

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

TEX. PENAL CODE ANN. § 9.31(a). "Reasonable belief" is defined as one that would be held by "an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42). Use of force is not justified in response to verbal provocation alone. *Id.* § 9.31(b)(1).

A person is justified in using deadly force in self-defense if he would be justified in using force against another person under § 9.31 and if the person "reasonably believes that deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force . . . [or] to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery." *Id.* § 9.32(a). "Deadly force" is defined as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3).

Although Texas law formerly imposed a duty to retreat on persons asserting self-defense, the current law provides:

> [a] person who has a right to be present at the location where the force is used, who has not provoked the person against whom the force is used, and who is not engaged in criminal activity at the time the force is used is not required to retreat before using force as described by this section.

*Id.* § 9.31(e) (addressing use of force); § 9.32(c) (addressing use of deadly force). Further, if the provisions in §§ 9.31(e) or 9.32(c) are met, "a finder of fact may not consider whether the actor failed to retreat" in considering whether the actor "reasonably believed that the use of [force or] deadly force was necessary." *Id.* § 9.31(f) (addressing use of force); § 9.32(d) (addressing use of deadly force).

Regarding defense of third persons, a person is justified in using force or deadly force against another to protect a third person if

> (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and
>
> (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

*Id.* § 9.33.[3]

### C. Analysis

There is no dispute Appellant intended to shoot Jimenez, committed an act clearly dangerous to human life by shooting Jimenez, and knew he could cause Jimenez to die or suffer serious bodily injury by shooting him. Appellant admitted these facts during cross-examination at trial. Appellant also acknowledged his handgun was a deadly weapon. Along with the other witness testimony and evidence presented at trial, Appellant's admissions are sufficient to prove the elements of murder under at least one of the State's alleged theories. *See* TEX. PENAL CODE ANN. § 19.02(b); *see also Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020) ("Self-defense is a confession-and-avoidance defense requiring the defendant to admit to his otherwise illegal conduct." "He cannot both invoke self-defense and flatly deny the charged conduct."); *Alonzo v. State*, 353 S.W.3d 778, 780-81 (Tex. Crim. App. 2011) (a defendant in a murder case who claims self-defense necessarily acts intentionally or knowingly in causing the individual's death). Appellant does not challenge the

---

[3] Appellant does not claim that his use of deadly force was presumably reasonable under § 9.32(b), and thus we need not address that area of self-defense law. *See* TEX. PENAL CODE ANN. § 9.32(b) (listing situations in which the use of deadly force is presumed reasonable).

14

legal sufficiency of the evidence supporting the elements of murder; instead, he argues the State did not disprove his claims of self-defense and defense of a third party beyond a reasonable doubt. Thus, the only issue is whether Appellant's use of deadly force against Jimenez was legally justified.

Appellant argues he was justified in using deadly force because (1) Appellant did not start the fight, and Jimenez escalated it by ripping off his shirt and displaying aggressive and "raging" behavior; (2) Appellant fired warning shots in the air in an attempt to de-escalate the fight; (3) Jimenez charged toward Appellant; (4) Jimenez assaulted the passengers in the Mustang and attempted to remove D.N. from the vehicle, justifying Appellant's use of deadly force to prevent Jimenez's commission or attempted commission of assault, aggravated assault, kidnapping, or murder of the passengers; (5) when Appellant shot Jimenez and neutralized the threat, Appellant did not fire additional shots or aim the handgun at anyone else but instead drove away from the threat; and (6) Appellant reported the shooting to law enforcement and did not flee the scene or attempt to conceal or destroy evidence of the shooting, undercutting the notion that he was conscious of his guilt.

The record supports only a few of these assertions. The undisputed evidence showed Appellant fired several shots in the air prior to shooting Jimenez,[4] and the witnesses agreed Garcia and Jimenez were acting aggressively and punched D.N. and Martinez through the Mustang's window prior to the shooting. Nevertheless, many of Appellant's claims in his testimony or his characterizations of the evidence are either contradicted by testimony from at least one witness or unsupported by the record. For example, Appellant claimed he was not drinking alcohol or

---

[4] As the State points out, Appellant cites no legal authority to support the proposition that firing a warning shot from a firearm constitutes de-escalation under the law of self-defense.

15

smoking marijuana while he was driving, but Martinez asserted he was. Martinez also testified Appellant was driving erratically and seemed on edge while driving to Garcia's house, suggesting Appellant anticipated the potential for violence when they arrived. After Appellant arrived at the house, he parked several houses away and put his handgun in his lap; although Appellant claimed he did not want to take the weapon with him when he went inside Garcia's house, a reasonable inference is that he anticipated the need to use it in the immediate future. Although Appellant denied any involvement in starting the initial fight, Garcia testified Banda told him Appellant offered to pay Banda to assault Garcia, suggesting Appellant had at least some role in starting the physical fight. The witnesses testified that Banda and Garcia initially fought, and according to Garcia, after Jimenez told them to calm down, he joined the fight against Banda. Appellant admitted he told D.N. to join the fight and help Banda, further suggesting Appellant's involvement in escalating the fight.

Although the witnesses agreed Jimenez and Garcia were standing by the Mustang when they assaulted D.N. who was inside the vehicle, their testimony differs as to what Jimenez was doing when Appellant shot him. Garcia testified Jimenez was standing by, but not reaching into, the vehicle and was about 79 inches away from Appellant when Appellant stared at him then shot him. In contrast, Appellant testified that Jimenez "lunge[d]" forward at him when Appellant shot him. But all witnesses, including Appellant, agreed Jimenez was not reaching into the vehicle or actively assaulting anyone at the moment Appellant shot him. And it was undisputed that Appellant was the only person with a weapon during the incident.

The evidence also suggests Appellant had at least some involvement in starting the initial fight and Jimenez, unarmed, was not actively engaged in any act other than standing by Appellant's vehicle in the moment Appellant shot him. Although Appellant claims he was justified in using

16

deadly force because Jimenez lunged at him, the jury was free to reject Appellant's testimony and believe the other evidence suggesting Jimenez did not lunge at Appellant. And although Appellant claims Jimenez was aggressive and "raging" at the time of the shooting, there is no evidence in the record to indicate that such behavior would have justified Appellant's use of deadly force. Moreover, to the extent Appellant argues Jimenez's yelling or aggressive words justified Appellant's shooting, Appellant would not be justified in using force based on verbal provocation alone. *See* TEX. PENAL CODE ANN. § 9.31(b)(1).

The jury was also free to reject Appellant's claim that he reported the incident to law enforcement. Although Appellant testified that he told Valdez about the shooting while asking for an Uber, Appellant did not "report" the incident to Valdez in Valdez's capacity as a law-enforcement officer. Instead, Valdez's status as a detention officer appears to be merely a coincidence, and Appellant's contact with Valdez seems to have been brought on by Appellant's attempt to find a way to exit the area not Appellant's desire to report the shooting to law enforcement. And although Appellant claimed he told Valdez he had just been involved in a shooting, Appellant acknowledged that Valdez did not testify to that fact. Instead of reporting the incident to law enforcement, the evidence suggested Appellant fled the scene in his vehicle and struck two other vehicles in his attempt to get away, did not contact law enforcement, and denied possessing a handgun when officers apprehended and searched him, all of which evince Appellant's consciousness of guilt. *See Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) (defendant who left shooting scene and did not get help for the victim or report the shooting to law enforcement evinced the defendant's consciousness of guilt and undercut his self-defense claim); *Liller v. State*, No. 08-16-00309-CR, 2018 WL 3583877, at *5

17

(Tex. App.—El Paso July 26, 2018, pet. ref'd) (not designated for publication) (a defendant's flight from the scene evinces a consciousness of guilt).

Finally, the evidence does not suggest that Jimenez or Banda were committing or attempting to commit aggravated assault, kidnapping, or murder of any person at the moment Appellant shot Jimenez, rendering this justification for shooting Jimenez unavailable. *See id.* 9.32(a)(2)(B) (allowing use of deadly force to prevent the commission of one of these offenses).

Based on the evidence, the jury could have rationally rejected Appellant's claim that he reasonably believed his use of deadly force was immediately necessary to defend himself or a third person from Jimenez. *See* TEX. PENAL CODE ANN. §§ 9.31(a), 9.32(a); *see also Henley v. State*, 493 S.W.3d 77, 94 (Tex. Crim. App. 2016) (defendant could not reasonably believe that his use of force was "immediately necessary" where the evidence did not suggest that an unlawful force was threatening a third party "at [the] moment" the defendant used force); *Bundy v. State*, 280 S.W.3d 425, 435 (Tex. App.—Fort Worth 2009, pet. ref'd) (defendant's use of deadly force was not justified in response to the victim's attempt to punch the defendant one time because the victim's use of force did not constitute deadly force under § 9.01(3)); *Eisenman v. State*, No. 13-05-705-CR, 2008 WL 2515877, at *5 (Tex. App.—Corpus Christi Jan. 10, 2008, pet. ref'd) (mem. op., not designated for publication) (defendant's distance from the victim at time of shooting suggested the victim was not an immediate threat necessitating use of deadly force).

### D. Conclusion

Through its guilty verdict, the jury implicitly rejected Appellant's self-defense claims. *See Braughton*, 569 S.W.3d at 608. Recognizing the jury's fact-finding role and its discretion to determine witness credibility and resolve conflicts in favor of the verdict, we conclude the record

contains legally sufficient evidence to allow a rational jury to find against Appellant's claims of self-defense and defense of a third party beyond a reasonable doubt.

Accordingly, we overrule Appellant's sole issue.

## III. CONCLUSION

We affirm the trial court's judgment supporting Appellant's conviction.

LISA J. SOTO, Justice

May 11, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.

(Do Not Publish)