

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-23-00074-CR

---

CHARLENE CHAPPELL KEIGI, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 20-0383X

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

## MEMORANDUM OPINION

Charlene Chappell Keigi appeals her conviction for murdering[1] her ex-boyfriend, Terry Thomas. The jury rejected Keigi's self-defense argument and found her guilty. At the punishment phase, Keigi's request for a jury-charge instruction on sudden passion was denied by the trial court. After reviewing the record and applicable law, we affirm the trial court's judgment.

## I.       Background

Thomas and Keigi were in a tumultuous relationship for approximately five years before Keigi shot Thomas on the back porch of the home they shared in rural Harrison County on September 14, 2020. Harrison County Investigator Mack Fuller and other deputies responded to multiple calls at the home over a period of years, which Fuller described as "back and forth, back and forth, kind of nitpicky . . . a lot of civil issues" that law enforcement could not resolve. Fuller characterized the couple's relationship as "toxic."

Keigi did not testify, but two recorded interviews of her were played for the jury, as well as three telephone calls she made to 9-1-1. Keigi used her cell phone to record events immediately before the shooting and the shooting itself. That recording was also played for the jury and is integral to our review of Keigi's appellate arguments.

---

[1]*See* TEX. PENAL CODE ANN. § 19.02 (Supp.). The punishment issue of sudden passion replaced the former offense of voluntary manslaughter on September 1, 1994. *See* Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 1.01, sec. 19.05, 1993 Tex. Gen. Laws 3586, 3614.

## A. Keigi's First 9-1-1 Call and Her Cell Phone Recording of the Shooting

The afternoon of the shooting, Keigi called 9-1-1 when she discovered Thomas was on the property. The 9-1-1 call was received at 4:05 p.m.[2] During that call, Keigi explained to the dispatcher that Thomas just arrived on her property and was not supposed to be there. She explained to the dispatcher that Thomas moved out in June and executed a change of address for his mail, gave the dispatcher her phone number, and described Thomas's appearance. The dispatcher told Keigi that a deputy had been dispatched, and Keigi told the dispatcher she would go take a photo of Thomas.

Keigi's cell phone recording made of events leading up to the shooting is just over three minutes long. Keigi began by going outside and recording Thomas in the yard. He then approached what seemed to be the front door. Keigi narrated, "He's at the front door. He's trying to come in." She moved around the house and, approximately one minute later, said, "[Let's] see where he's at." She recorded Thomas carrying floor mats to his truck then turn to face her from across the yard. He called out to her asking about a missing tailgate and began to walk toward her. He crossed the yard, prompting Keigi to latch a chain-link gate, walk up the porch steps, and retreat into the house. She closed the sliding glass door and put a curtain rod in the track to secure the door. When Thomas reached the sliding glass door and put his hands on the door's handle, he again asked about the tailgate for the truck. Just before she fired the three shots, she said to Thomas, "They're on their way." The recording then went out of focus. After the first shot, the glass door shattered. After the next two shots, Thomas can be heard groaning.

_____
[2]The 9-1-1 dispatcher testified as to the time of the call. Investigator Fuller testified that the initial 9-1-1 call came in at 4:03 p.m.

3

**B.      Keigi's Second and Third 9-1-1 Calls**

At 4:10 p.m. Keigi made her second call to 9-1-1.  Keigi told the dispatcher that she had shot Thomas, that he was lying on the porch, and that he tried to break in.

The third 9-1-1 call was either a continuation of the second or a new call after the second was disconnected—the record is not clear.  The third recording is more than eight minutes in duration.  On the third recording, Keigi can be heard breathing loudly and repeating that Thomas had been "messing" with her, that she did not want to shoot him, and that she would not let him hurt her.

**C.      Fuller's Interviews with Keigi**

Fuller interviewed Keigi at the scene while she sat in the back of a squad car.  Fuller testified that he began interviewing her at 4:45 p.m.[3]  Keigi answered Fuller's questions.  She did not say that she feared for her life or safety, though she did say she believed Thomas was determined to come into the house.

Fuller conducted a second interview, which lasted approximately one hour and seven minutes, at the sheriff's office beginning at 7:26 p.m.  Keigi described the history of her relationship with Thomas, which eventually reduced to sharing the house as roommates until Thomas moved out two or three months before the shooting.  Keigi repeatedly told Fuller that she knew he was determined to enter the house and harm her.  She accused Thomas of changing her mailing address without her permission, or refusing to give her her mail, of cutting the power cords to her various appliances in the house after he moved out, and of taking the showerhead

_____
[3]This recording is just under twenty-two minutes in duration.

4

out of the house. In his interview with Keigi at the sheriff's office, Fuller made reference to a legal proceeding between the two where they had tried to evict one another from the home. Keigi alleged that Thomas forged her signature on a deed, and Fuller said a forgery case had been filed against Thomas.

Keigi did not describe any imminent threat by Thomas other than her unsupported statements of certitude that he intended to do her harm. Fuller asked why she felt that way when Thomas never harmed her. In response, she repeated her belief that that was his intent—to get in the house and harm her.

Keigi described the moment when Thomas arrived on the back porch, calling to her through the glass door about the missing tailgate. She told Fuller she did not say anything and just pointed the gun and shot Thomas. She said she knew Thomas had a knife, because of the power cords that were cut throughout the house. She did say she was "panicking" when Thomas tried to open the sliding glass door. When informed that Thomas died, Keigi said she was sorry to hear that. When told she was being arrested, she simply said, "That's fine."

### D. Other Testimony

The pathologist who autopsied Thomas's body testified that Thomas suffered three gunshot wounds, two to his back and one to his arm. "[N]one of the gunshot wounds had soot or stippling" at the entrance locations, indicating the shots were fired from more "than two to three feet" away.

We will address Keigi's issues in the reverse order of their presentation.[4]

## II. The Jury Rejected Self-Defense[5]

### A. Standard of Review

We first address Keigi's claim that she proved self-defense as a matter of law.

In reviewing the legal sufficiency of the evidence to support the fact-finder's rejection of the defensive issue of self-defense,

> we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

### B. Analysis

Although the cell phone recording viewed by the jury showed Thomas attempting to open the sliding glass door, Thomas was not armed and was not shouting or threatening Keigi with deadly force at the time. While Keigi told Fuller that she "kn[e]w" Thomas had a knife, she

---

[4]We address Keigi's points of error out of order so our opinion will follow the order of trial. Also, she relies on the same background facts to support both claims.

[5]Under the Texas Penal Code, a person is guilty of the crime of murder if she "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1). However, the code also states that an individual "is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force," TEX. PENAL CODE ANN. § 9.31(a), but the code specifies that the "use of force against another is not justified . . . in response to verbal provocation," TEX. PENAL CODE ANN. § 9.31(b)(1). Furthermore, the code provides that an individual "is justified in using deadly force against another . . . if the actor would be justified in using force against the other" and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a). "'Deadly force' means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." TEX. PENAL CODE ANN. § 9.01(3).

admitted she never saw him with one, and law enforcement did not find a knife on Thomas's person or at the scene. There was no soot or stippling on any of the three gunshot wounds, indicating each shot was fired from more than two or three feet away. Two of the shots hit Thomas in the back.

Fuller testified that Keigi's recording was "helpful in determining that this was not a case of self-defense." Other than a time she claimed he hurt her foot, Keigi told Fuller that Thomas had never been violent with her. Fuller testified that the Harrison County Sheriff's Office never received a report of domestic violence among the couple and that, to his knowledge, neither had any other law enforcement agency. Thomas was shot from behind while on the other side of the glass door from more than two or three feet away.[6] Most importantly, there is recorded evidence of the events preceding the shooting and the shooting itself. There was no suggestion that Thomas was threatening Keigi or that he was exhibiting deadly force.

"Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914. Once the defendant produces some evidence of self-defense, the State "bears the burden of persuasion to disprove the raised defense." *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing *Saxton*, 804 S.W.2d at 913–14). This "requires only that the State prove its case beyond a reasonable doubt." *Id.* (citing *Saxton*, 804 S.W.2d at 913).

---

[6]*See Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) (considering the fact that victim was shot in the back as evidence defendant's use of deadly force was unreasonable).

7

Keigi chose not to testify and received a self-defense instruction.

The jury heard and saw the evidence summarized above and was uniquely enabled to determine the facts since the event was recorded. The jury was also free to form its own conclusions about Keigi's subjective beliefs. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) ("As fact[-]finder, the jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties."). Keigi's "defensive claims hinged almost entirely on [her] credibility" in the statements she made in her interviews with Fuller and her conduct in the 9-1-1 calls. *Braughton v. State*, 569 S.W.3d 592, 610 (Tex. Crim. App. 2018). "[B]y its implicit rejection of [Keigi's] defenses in finding [her] guilty, the jury necessarily signaled its disbelief" in the credibility of her statements to Fuller expressing her fear of Thomas. *Id.* at 611. We overrule Keigi's second point of error.

## III.    No Sudden-Passion Instruction Warranted

In her first point of error, Keigi claims that the trial court should have instructed the jury on sudden passion in the punishment phase of trial.[7] Upon review of the record, we find no error in the trial court's denial of Keigi's request for the instruction.[8]

---

[7]*See* TEX. PENAL CODE ANN. § 19.02(d). Had Keigi shown by a preponderance of the evidence that she shot Thomas in the thrall of sudden passion, her murder conviction would have been punishable as a second-degree felony. *Id.*

[8]Keigi argues that "[s]elf-defense and sudden passion are intricately intertwined, and except in rare instances, facts that give rise to a self-defense issue also give rise to a sudden-passion issue." The Texas Court of Criminal Appeals, however, has consistently pointed to the need for evidence to support each particular theory. "This Court . . . [has] ruled . . . that when the evidence raises the issue of self-defense, a defendant is not entitled to a jury instruction on voluntary manslaughter [the legal predecessor of the sudden passion statute] unless there is evidence that the offense occurred under the influence of sudden passion arising from an adequate cause." *Gonzales v. State*, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986); *see Luck v. State*, 588 S.W.2d 371, 374–75 (Tex. Crim. App. 1979).

## A.     Standard of Review

"When an appellant protests that the trial court erred not to grant h[er] request to charge the jury regarding sudden passion, a reviewing court must first determine whether the complained-of error exists."  *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). Upon review, if we find error, we review for harm.  *Id.*[9]

To be entitled to an instruction on sudden passion, Keigi had to establish the following:

(1) that [she] acted under the immediate influence of terror, anger, rage, or resentment; (2) that [her] sudden passion was induced by some provocation by [Thomas], and that such provocation would commonly produce such passion in a person of ordinary temper; (3) that [she] committed the murder . . . before regaining [her] capacity for cool reflection; and (4) that there was a causal connection between [Thomas]'s provocation, [her] passion, and the homicide.

*Beltran v. State*, 472 S.W.3d 283, 294 (Tex. Crim. App. 2015).

In *Daniels v. State*, the Texas Court of Criminal Appeals explained that "'fear' that rises to the level of 'terror' may constitute sudden passion when its cause is such that would commonly produce a degree of terror 'sufficient to render the mind incapable of cool reflection.'"  *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983).  On the other hand, "a bare claim of 'fear' does not demonstrate 'sudden passion arising from adequate cause.'"  *Id.* Daniels's attorney asked him, "[W]ere you afraid that [the deceased] was going to kill you?"  *Id.* at 460 (second alteration in original).  Daniels answered, "Yes."  *Id.*  That was not sufficient to

---

[9]Keigi requested the instruction.  If we find that the trial court erred by not including the instruction in the charge, we review the record to determine whether "the appellant . . . suffered 'some harm.'"  *Wooten*, 400 S.W.3d at 606 (quoting *Trevino v. State*, 100 S.W.3d 232, 242 (Tex. Crim. App. 2003) (per curiam)).  Because we find sudden passion was not raised by the evidence, we do not review for harm.  *See Posey v. State*, 966 S.W.2d 57, 61 (Tex. Crim. App. 1998) ("*Almanza* does not apply unless the appellate court finds 'error' in the jury charge.") (citing *Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984)).

warrant an instruction on voluntary manslaughter, the precursor to the present sudden-passion law. *Id.*

In *Wooten*, the defendant argued for a jury instruction on sudden passion, claiming he was "overwhelmed by emotions of fear, disorientation, confusion, et cetera." *Wooten*, 400 S.W.3d at 604. The trial court pointed out that the jury had been instructed on self-defense in the guilt phase and rejected that argument. The court denied the requested sudden-passion instruction.

"It is highly unlikely that a jury that had already rejected the appellant's claim that he reasonably believed that deadly force was immediately necessary to defend himself would nevertheless find in his favor on the issue of sudden passion." *Id.* at 609.[10]

In the recording of the murder, there was no suggestion that Keigi was under the immediate influence of any terror, anger, rage, or resentment. In the 9-1-1 recording immediately after she shot Thomas, Keigi was able to tell the dispatcher what happened in a declarative, relatively dispassionate voice. Only in the next few minutes did her voice begin to express hysteria. Similarly, in the two interviews with Fuller, she did not claim to have been afraid or terrified of Thomas and only expressed anger when describing past behaviors by him that had upset her.

As in *Bradley v. State*, "[t]here was no [evidence] from any source to indicate [Keigi] became enraged, resentful or terrified immediately prior to the shooting." *Bradley v. State*, 688

---

[10]In *Wooten*, the Texas Court of Criminal Appeals did not address whether it was error to deny the requested instruction and just reviewed for harm. *Wooten*, 400 S.W.3d at 607. In *Wooten*, there was substantial evidence of an intense argument, alleged threats from the victim, and gunfire from both parties. *Id.* at 603. That is significantly different from the situation at bar, where we literally have a recording of the preceding encounter and shooting.

S.W.2d 847, 852 (Tex. Crim. App. 1985), *overruled on other grounds by Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998). Nothing in Keigi's statements to Fuller or in her video recording of the shooting indicated she "had been emotionally aroused at the time of the shooting [or] describe[d] [any] cause for such arousal." *Stevens v. State*, 671 S.W.2d 517, 523 (Tex. Crim. App. 1984). Even if we were to construe Keigi's statement to Fuller that she was panicking when Thomas tried to open the door or her other statements that she believed he would harm her if he gained entrance as declarations that she was afraid of Thomas, an "appellant's claim that [s]he was scared of the deceased [i]s insufficient to raise the issue that [s]he was acting under the immediate influence of sudden passion arising from an adequate cause." *Gonzales*, 717 S.W.2d at 357–58.

There is no evidence in the record that Keigi shot Thomas while under the influence of sudden passion. Keigi was not entitled to a jury instruction on sudden passion, and the trial court did not err in refusing such. We overrule Keigi's first point of error.

We affirm the trial court's judgment.

Charles van Cleef
Justice

Date Submitted:     November 14, 2023
Date Decided:       December 13, 2023

Do Not Publish